UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

04CR 1 0 0 6 0 RCL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. |
| | ) | |
| v. | ) | VIOLATIONS: |
| | ) | |
| GEORGE SCHUSSEL, | ) | 18 U.S.C. § 371 - Conspiracy |
| Defendant | ) | 26 U.S.C. § 7201 - Tax Evasion (2 Counts) |
| | ) | |

## INDICTMENT

THE GRAND JURY CHARGES THAT:

### INTRODUCTION

At all times material to this Indictment:

1. The defendant GEORGE SCHUSSEL (hereinafter referred to as "SCHUSSEL"), a resident of Massachusetts, was the Chief Executive Officer ("CEO") and principal shareholder of Digital Consulting, Inc. (hereinafter referred to as "DCI"). As CEO, SCHUSSEL directed the operations of DCI and made the principal business decisions for the company.

2. DCI was a closely held domestic corporation located in Andover, Massachusetts, that was engaged in the business of planning and conducting computer based training seminars, trade shows, and conferences. Prior to 1996, DCI was a subchapter C corporation, electing to become a subchapter S corporation from in or about 1996 to present.

3. SCHUSSEL was also President and the principal shareholder of Digital Consulting International, Ltd. (hereinafter referred to as "DCIL"), a Bermuda based corporation that was utilized by him to facilitate the diversion of taxable income that he failed to report.

4. "R.G.," an unindicted co-conspirator, was the President and Chief Operating Officer,

1

and also 5% owner of DCI. As President, R.G. acted primarily as an administrator at DCI, assuming responsibility for the technical operations of the company.

5. "D.R.," an unindicted co-conspirator, was the controller of DCI, with primary responsibility for DCI's internal accounting system and the monitoring of business receipts and expenses.

6. DCI maintained a business operating account (Account No. XXXXX2842) at Northmark Bank (hereinafter referred to as "Northmark account"), located in Andover, Massachusetts, which account SCHUSSEL controlled.

7. DCIL maintained a bank account (Account No. XXXXXX2906) at the Bank of Bermuda Limited (hereinafter referred to as "Bank of Bermuda account") in Hamilton, Bermuda, which account SCHUSSEL controlled and caused payments to the corporation to be deposited into it as part of his effort to hide taxable income.

8. SCHUSSEL maintained and controlled several accounts at Fidelity Investments, among which, was an account (Account No. XXXXX3199) (hereinafter referred to as "Fidelity account"), held in the name of Digital Consulting International, and also referred to as Digital Consulting International Fund 70, to which SCHUSSEL directed the wire transfer of monies from the Bank of Bermuda account.

9. DCI derived its gross receipts from events it planned and coordinated in the United States and various foreign countries, which included, but was not limited to, Canada, France, the United Kingdom, Germany and other European countries.

10. DCI's business proceeds were generated from the sponsoring of computer based training seminars, conferences, trade shows, and the contracting of guest speakers. DCI acted as

a producer, designing and managing individual events, and its primary source of revenue came from the contracting and selling of booth space to vendors and from ticket sales to participants who attended the events.

## COUNT ONE
### (Conspiracy – 18 U.S.C. § 371)

11. Paragraphs 1 through 10 are re-alleged and incorporated as if fully set forth herein.

12. From in or about January 1988, and through in or about May 8, 1998, both dates being approximate and inclusive, in the District of Massachusetts and elsewhere, defendant

GEORGE SCHUSSEL,

together with others both known and unknown to the Grand Jury, did knowingly and willfully conspire to defraud the United States by impeding, impairing, obstructing and defeating the lawful government function of the Treasury Department and the Internal Revenue Service, an agency of the United States, in the ascertainment, computation, assessment and collection of revenue: to wit, federal income taxes.

## MANNER AND MEANS OF THE CONSPIRACY

Among the means and methods by which the co-conspirators carried out the conspiracy were the following:

13. As part of the conspiracy and in order to further its objectives, the defendant GEORGE SCHUSSEL, together with others known and unknown to the Grand Jury, set up DCIL, a corporation purportedly operating in Hamilton, Bermuda, that was supposed to assist DCI in expanding its international business, but in fact was used to evade the payment of income tax.

3

14. It was further part of the conspiracy that in order to provide DCIL with the appearance of a legitimate business entity, when in fact, DCIL did not function as a viable company with office space and employees, SCHUSSEL hired and paid quarterly fees to Ardon Management Services, Ltd., a company located in Bermuda, to handle corporate filings and to act as corporate secretary to DCIL.

15. It was further part of the conspiracy that SCHUSSEL, together with others known and unknown to the Grand Jury, diverted taxable income, to the Bank of Bermuda account, which SCHUSSEL controlled and used to deposit unreported income generated by DCI.

16. It was further part of the conspiracy that SCHUSSEL upon opening the Bank of Bermuda account, directed that the bank statements be forwarded to his residence, located at 5 Kimberly Terrace, Lynnfield, MA, United States 01940, and then directed on or about August 1994, SCHUSSEL that the bank statements to be mailed to his offices at 204 Andover Street, Andover, MA, United States 01810.

17. It was further part of the conspiracy that SCHUSSEL directed D.R. to maintain the check register for the Bank of Bermuda account and caused D.R. to write checks drawn on the Bermuda account, which checks SCHUSSEL would sign or authorize D.R. to sign by using a signature stamp that read "G. Schussel." SCHUSSEL directed D.R. to write checks made payable to different individuals and entities, including checks that were for the purpose of making quarterly payments of fees to Ardon Management Services, Ltd.

18. It was further part of the conspiracy that SCHUSSEL, together with others known and unknown to the Grand Jury, tracked the revenues and expenses of DCI to determine what amount of DCI generated income could be diverted to the Bank of Bermuda account.

4

SCHUSSEL determined when DCI revenue would be transferred to the Bank of Bermuda account and the actual amount of unreported revenue which would be diverted.

19. It was further part of the conspiracy that SCHUSSEL directed D.R. to send a substantial number of customer checks that were received by DCI for services rendered to the Bank of Bermuda for deposit in Account No. XXXXXX2906, instead of depositing the customer checks in DCI's operating account, held and maintained at Northmark Bank.

20. It was further part of the conspiracy that by diverting customer checks to the Bank of Bermuda account, SCHUSSEL prevented the amount of money denoted on the checks from being included in DCI's daily business receipts which would eventually be posted in DCI's general ledger, thereby impeding a true and accurate account of DCI's gross receipts.

21. It was further part of the conspiracy that on various dates and on numerous occasions, in order to facilitate the diversion of funds, SCHUSSEL caused D.R. to prepare letters of instruction for the Bank of Bermuda Limited, which letters directed personnel at the Bank of Bermuda Limited to deposit enclosed DCI customer checks to the account of Digital Consulting International, Ltd., # XXXXXX2906. Numerous letters of instruction were signed by D.R., in her capacity as controller at DCI.

22. It was further part of the conspiracy that SCHUSSEL, together with others known and unknown to the Grand Jury, caused letters of instruction to be sent to personnel at the Bank of Bermuda Limited, directing that certain funds be wire transferred from the Bank of Bermuda account to SCHUSSEL's Fidelity account.

23. It was further part of the conspiracy that SCHUSSEL caused D.R. to review the bank statements from the Bank of Bermuda account, for the purpose of, among other things,

ensuring that the check deposits sent to that account were accurately credited and the wire transfers made from that account were accurately debited.

24.  It was further part of the conspiracy that SCHUSSEL, in addition to diverting DCI customer checks to the Bank of Bermuda account, together with others known and unknown to the Grand Jury, for the purpose of evading the payment of income tax, caused checks, drawn from DCI's Northmark account, to be written and made payable directly to DCIL, which checks would then be deposited in the Bank of Bermuda account.

25.  It was further part of the conspiracy that SCHUSSEL, together with others known and unknown to the Grand Jury, directed that "payments" be made by DCI to DCIL for services that DCIL purportedly provided to DCI, when in fact, no services had been provided by DCIL. SCHUSSEL caused such "payments" to be deposited at the Bank of Bermuda account.

26.  It was further part of the conspiracy that SCHUSSEL, along with others known and unknown to the Grand Jury, also caused checks to be drawn from DCI "user group accounts." User group accounts were bank accounts controlled by SCHUSSEL and were maintained at Northmark Bank, set up separately in the name of DCI individual customers, such as "XYZ, Inc. d/b/a DCI." The user group accounts were used to maintain the revenues of a specific event and to pay expenses associated with the event, such as conferences, trade shows and events for individual customers of DCI.

27.  It was further part of the conspiracy that SCHUSSEL caused checks that were drawn on DCI's user group accounts to be made payable to DCIL, which checks were then deposited at the Bank of Bermuda account.

28.  It was further part of the conspiracy that SCHUSSEL had an agreement with R.G.,

that a certain percentage of the DCI proceeds that were diverted to the Bank of Bermuda account, would be distributed to R.G. as part of his compensation and based on his 5% ownership in DCI, income that both SCHUSSEL and R.G. in fact knew had been concealed and diverted to Bermuda to evade taxes due and owing to the IRS.

29. It was further part of the conspiracy that, pursuant to the agreement with SCHUSSEL, R.G. received a minimum of 5% of the proceeds that were diverted to the Bank of Bermuda account, and on certain dates, R.G. received more than 5% of the proceeds transferred to that account, said percentage depending upon the actual amount of DCI income that SCHUSSEL directed to Bermuda.

30. It was further part of the conspiracy that D.R. kept track of the DCI proceeds diverted to the Bank of Bermuda, and maintained an accounting by means of a running spreadsheet, which included the amount of the diverted proceeds which was distributed to SCHUSSEL and R.G., proceeds that both SCHUSSEL and R.G. knew had been concealed and diverted to Bermuda to avoid the payment of income tax due and owing to the IRS on said income.

31. It was further part of the conspiracy that SCHUSSEL caused D.R. to prepare summary sheets that purported to report DCI's gross revenues and expenses, which were provided to DCI's accountant for use in the preparation of DCI's Corporate U.S. Tax Return. SCHUSSEL knew, in fact, said summary sheets did not contain the true and accurate revenues generated by DCI because of the substantial revenues which had been diverted to the Bank of Bermuda account.

32. It was further part of the conspiracy that SCHUSSEL, together with others known

7

and unknown to the Grand Jury, intentionally and willfully caused the filing of false and fraudulent Corporate U.S. Income Tax Returns to be filed with the IRS for the purpose of evading and defeating income tax due and owing for several years, in that, SCHUSSEL had concealed and failed to disclose the business receipts and income represented by checks that, at his direction, D.R. had not deposited into DCI's Northmark account, but rather, had diverted to DCIL's bank account in Bermuda.

33. It was further part of the conspiracy that SCHUSSEL, together with others known and unknown to the Grand Jury, diverted substantial amounts of DCI's gross receipts to the Bank of Bermuda account, including approximately $8,515,073.00 from in or about 1993 through in or about 1995.

34. It was further part of the conspiracy that SCHUSSEL, together with others known and unknown to the Grand Jury, for purposes of preventing discovery of DCI unreported income, endeavored to impede and obstruct an audit conducted by the IRS of DCI's 1995 Corporate U.S. Income Tax Return.

35. It was further part of the conspiracy that SCHUSSEL, together with others known and unknown to the Grand Jury, including R.G. and D.R., participated in meetings, including during the fall of 1997, where they discussed how to conceal from the IRS the relationship between DCI and DCIL in an effort to prevent the IRS from finding out about SCHUSSEL'S diversion of DCI unreported income to the Bank of Bermuda account.

36. It was further part of the conspiracy that SCHUSSEL, together with others known and unknown to the Grand Jury, caused a false and fraudulent contract to be provided to an employee of the IRS, the revenue agent conducting the audit for the IRS, in order to mislead the

revenue agent into believing that DCI and DCIL were companies that maintained a legitimate business relationship, and that DCI had made certain payments to DCIL pursuant to the contract, when, in fact, SCHUSSEL well knew that he controlled both DCI and DCIL and that there was no legitimate business relationship between the two companies.

37. It was further part of the conspiracy that SCHUSSEL, together with others known and unknown to the Grand Jury, for the purpose of preventing the IRS from discovering his diversion of DCI taxable income to Bermuda in 1995, caused false representations to be made to the revenue agent on his behalf, by an attorney he hired to handle the IRS audit.

38. It was further part of the conspiracy that SCHUSSEL, together with others known and unknown to the Grand Jury, obstructed and impeded the IRS audit by falsely representing to the revenue agent that the relationship between DCI and DCIL had previously been reviewed and fully disclosed to other revenue agents during prior IRS audits of DCI, when in fact, as SCHUSSEL well knew, the true relationship between DCI and DCIL had been previously concealed and misrepresented to the IRS.

39. It was further part of the conspiracy that after the IRS had made its final adjustments relating to DCI'S corporate tax liability for 1995, which was assessed at $18,859.00, and SCHUSSEL'S personal tax liability for 1996, which was assessed at $170,644.00, SCHUSSEL made the final payments requested by the IRS in order to close the audit, agreeing to the amounts arrived at by IRS. SCHUSSEL well knew that the final payment amount given by the IRS had been calculated on the basis of false information provided to the revenue agent and was substantially less than the true and accurate tax due and owing by SCHUSSEL on behalf of DCI's corporate income tax return and his own personal income tax return, given the

concealment of the funds diverted to Bermuda in 1995.

## OVERT ACTS

40. In furtherance of the conspiracy and to accomplish its objectives, the defendant committed, or caused to be committed, among others, the following overt acts:

a. In or about January 1988, SCHUSSEL incorporated DCIL, a company located in Bermuda, in which the corporate officers, as noted in a certification by Ardon Management Services Ltd., consisted of SCHUSSEL as President, his wife and R.G. as Vice Presidents, and Ardon Management as DCIL's Secretary.

b. On or about February 22, 1988, SCHUSSEL caused a bank account to be opened in Bermuda, and along with his wife and daughter, signed a bank signature card that would allow each of them to authorize money transfers from the account and to sign checks drawn on the Bank of Bermuda account.

c. On or about January 25, 1989, SCHUSSEL caused a check to be written, drawn from the Bank of Bermuda account, in the amount of $946.25 made payable to Ardon Management Services, Ltd.

d. On or about December 4, 1989, SCHUSSEL caused a $50,000.00 check to be made payable to him, written from the Bank of Bermuda account.

e. On or about November 28, 1990, D.R. wrote a check in the amount of $1600.00, payable to "Accountant General" to cover the annual government fee of maintaining DCIL's corporate status in Bermuda.

f. On or about February 28, 1991, SCHUSSEL caused a $28,000.00 check to be made payable to him, written from the Bank of Bermuda account.

 g. In or about December 1991, SCHUSSEL directed that a "DCI Memo" dated September 12, 1989 be given to revenue agent Larry Griffin, an employee of the IRS conducting an audit of DCI's 1989 Corporate U.S. Income Tax Return, which memo falsely stated that DCIL was owed a certain payment for agent commissions on conferences set up by DCIL.

 h. On or about October 30, 1992, SCHUSSEL caused $250,000.00 from the Bank of Bermuda account to be deposited in the Fidelity account, which account he controlled and used for his own personal benefit.

 i. On or about February 28, 1993, D.R. wrote a letter to the Bank of Bermuda Limited, instructing that a check in the amount of $8750.00 be deposited in the Bank of Bermuda account.

 j. On or about June 28, 1993, SCHUSSEL caused a letter to be sent to the Bank of Bermuda, directing the bank to wire transfer $100,000.00 from the Bank of Bermuda account to the Fidelity account.

 k. On or about August 25, 1993, SCHUSSEL directed D.R. to forward a check in the amount of $337,190.95 to the Bank of Bermuda Limited, for deposit in Account No. XXXXXX2906.

 l. On or about September 2, 1993, SCHUSSEL directed D.R. to write a letter to the Bank of Bermuda Limited, instructing that the bank wire transfer $337,000.00 from the Bank of Bermuda account to the Fidelity account.

 m. At various times throughout this conspiracy, at SCHUSSEL'S direction, D.R. reviewed the monthly statements from the Bank of Bermuda Limited to ensure that deposits made into the account were properly credited and transfers made out of the account were accurately debited.

n. On or about December 31, 1993, SCHUSSEL caused a $17,000.00 wire transfer to be made from the Bank of Bermuda Limited to Duncan Ford Lincoln Mercury in Key West, Florida for the purchase of a 1994 Chrysler LeBaron automobile.

o. On or about July 18, 1994, SCHUSSEL caused a letter to be sent to the Bank of Bermuda Limited directing that the address for the account held there be changed to 204 Andover Street, Andover MA 01810.

p. On or about March 15, 1994, SCHUSSEL caused to be filed with the IRS, a false and fraudulent Corporate U.S. Income Tax Return for DCI's calendar year 1993, which failed to include DCI proceeds diverted to the Bank of Bermuda Limited, thereby falsely reporting the amount of DCI taxable income for 1993.

q. On or about September 30, 1994, SCHUSSEL signed a memo which directed the Bank of Bermuda Limited to wire transfer $10,656.00 to the Royal Bank of Canada in Halifax, N.S.

r. On or about November 10, 1994, D.R. wrote a letter to the Bank of Bermuda Limited directing the bank to deposit a couple of checks she was forwarding, totaling $203,311.00, into the Bank of Bermuda account.

s. On or about November 16, 1994, SCHUSSEL caused R.G. to be given $2,050.00, approximately 10% of the $20,530.49, which had been forwarded in a series of checks for deposit to the Bank of Bermuda account.

t. On or about June 29, 1995, D.R. forwarded a number of checks totaling $675,000.00 to the Bank of Bermuda Limited, for deposit into the Bank of Bermuda account.

u. On or about June 29, 1995, SCHUSSEL signed a $50,000.00 check payable to

DCIL, drawn on a user group account, which check was deposited at the Bank of Bermuda account.

v.  On or about July 11, 1995, SCHUSSEL directed that $675,000.00 be wire transferred from the Bank of Bermuda account to the Fidelity account.

w.  From on or about January 20, 1995 through on or about December 27, 1995, D.R. maintained a running spreadsheet, which noted the DCI proceeds that were deposited to the Bank of Bermuda Limited and summarized the amount from those proceeds that were distributed to SCHUSSEL and R.G.

x.  In or about August 25, 1995, SCHUSSEL directed D.R. to write a check payable to Hemisphere Management Ltd., Client's Account, drawn on the Bank of Bermuda account in the amount of $5,000.00.

y.  On or about December 18, 1995, R.G. signed a $32,240.03 check payable to Digital Consulting Incorporated, drawn on a user group account check, which check was deposited in the Bank of Bermuda account.

z.  In or about February 2, 1996, SCHUSSEL directed the Bank of Bermuda to wire transfer $150,000.00 to the Fidelity account.

aa.  On or about March 15, 1996, SCHUSSEL caused the filing of a false and fraudulent United States Individual Income Tax Return, Form 1040, wherein he stated that his taxable income for calendar year 1995 was $1,030,785.00 and that the amount of tax due and owing was $383,106.00, when in fact SCHUSSEL well knew that his taxable income was substantially higher than that stated and that substantial additional taxes were due and owing to the United States of America.

bb.     On or about March 15, 1996, SCHUSSEL filed a false and fraudulent Individual U.S. Income Tax Return for the calendar year 1995 in which, among other things, he falsely represented the amount of taxable income and concealed his financial interest and signature authority in the Bank of Bermuda account.

cc.     On or about October 27, 1997, SCHUSSEL, D.R. and DCI's tax preparer, met with revenue agent Kelly (McGovern) Jordan, an employee of the IRS, regarding the audit of DCI's 1995 corporate income tax return, and falsely represented that all income received by DCI in 1995 was deposited at Northmark Bank.

dd.     In or about September 1997 through in or about November 1997, SCHUSSEL, caused steps to be taken to delete information in DCI's computer database relating to DCI's revenues in 1995, in an effort to falsely and fraudulently have the amount of DCI revenue noted in the database equal the amount of DCI revenue provided by SCHUSSEL in DCI's 1995 Corporate U.S. Income Tax Return.

ee.     In or about November 1997, SCHUSSEL engaged the services of a tax attorney to act as his agent for the purpose of representing him during the audit of DCI's 1995 corporate income tax return, which attorney SCHUSSEL used to impede and obstruct the audit.

ff.     On or about February 13, 1998, SCHUSSEL caused the tax attorney who was acting on his behalf, to provide the revenue agent with a false and fraudulent contract that purported to be executed between DCI and DCIL in September 1993, which contract contained the forged signature of a "J. Cardullo."

gg.     On or about March 11, 1998, SCHUSSEL caused the tax attorney who was acting on his behalf, to send a letter to the revenue agent, which letter falsely stated, among other things,

14

that SCHUSSEL was not an officer of DCIL and falsely represented that payments made by DCI to DCIL were pursuant to the contract purportedly executed between DCI and DCIL in September 1993.

    hh.    On or about May 6, 1998, SCHUSSEL signed IRS Form CG-4549, acknowledging and agreeing to income tax examination changes that the revenue agent had made to DCI's 1995 Corporate U.S. Income Tax Return which showed that $18,859.00 was additional income tax due for DCI's 1995 calendar year. As SCHUSSEL well knew, this amount was, in fact, substantially less than the true amount due to the IRS because SCHUSSEL had concealed DCI's true income for 1995 from the revenue agent during the course of the audit.

    All in violation of Title 18, United States Code, Section 371

## COUNT TWO
## (Tax Evasion – 26 U.S.C. § 7201)

The Grand Jury further charges that:

90. Paragraphs 1 through 10, and 13 through 40 are realleged and incorporated as if fully set forth herein.

91. That on or about March 11, 1998, in the District of Massachusetts and elsewhere, the defendant

## GEORGE SCHUSSEL

who was the primary shareholder and Chief Executive Officer of Digital Consulting, Inc., a corporation, did willfully attempt to evade and defeat a part of the income tax due and owing by said corporation to the United States of America for the calendar year 1995 by making and causing to be made false statements to a revenue agent of the Internal Revenue Service in order to mislead and impede an audit examination of Digital Consulting, Inc.'s 1995 United States Corporate Income Tax Return, IRS Form 1120; and by filing and causing to be filed with the Director, Internal Revenue Service Center, at Andover, Massachusetts, a false and fraudulent United States Corporate Income Tax Return, IRS Form 1120, wherein he stated that the taxable income for Digital Consulting, Inc. for the calendar year 1995 was $429,283.00 and that the amount of tax due and owing thereon was $145,956.00, for the purpose of concealing additional unreported taxable income received by said corporation during said calendar year, upon which said unreported taxable income, as GEORGE SCHUSSEL then and there well knew and believed, there were substantial additional taxes due and owing to the United States of America.

In violation of Title 26, United States Code, Section 7201

## COUNT THREE
(Tax Evasion – 26 U.S.C. § 7201)

The Grand Jury further charges that:

92. Paragraphs 1 through 10, and 13 through 40, are realleged and incorporated as if fully set forth herein.

93. That on or about March 11, 1998, in the District of Massachusetts and elsewhere, the defendant

### GEORGE SCHUSSEL

did willfully attempt to evade and defeat a part of the income tax due and owing by him to the United States of America for the calendar year 1995 by making and causing to be made false statements to a revenue agent of the Internal Revenue Service in order to mislead and impede an audit examination of Digital Consulting, Inc.'s 1995 United States Corporate Income Tax Return, IRS Form 1120; and by filing and causing to be filed with the Director, Internal Revenue Service Center, at Andover, Massachusetts, a false and fraudulent United States Individual Income Tax Return, IRS Form 1040, wherein he stated that his taxable income for calendar year 1995 was $1,030,785.00 and that the amount of tax due and owing thereon was $383,106.00, whereas GEORGE SCHUSSEL then and there well knew and believed, that his unreported taxable income for 1995 was substantially in excess of that stated and that upon said additional taxable income substantial additional taxes were due and owing to the United States of America.

In violation of Title 26, United States Code, Section 7201

A TRUE BILL

*[signature: Roger Allen]*
FOREPERSON OF THE GRAND JURY

*[signature: Carmen M. Ortiz]*
Carmen M. Ortiz
Assistant United States Attorney

Date: February 26, 2004

District of Massachusetts
February 26, 2004

Returned into The District Court by the Grand Jurors and Filed.

*[signature]* B Roland
Deputy Clerk
4:24 pm

18