UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
AT CLERKS OFFICE

2004 OCT 15  P 12: 50

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES OF AMERICA )
)
)
v. )  CRIMINAL NO. 04-10040-RCL
)
GEORGE SCHUSSEL, )
Defendant )
)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS GOVERNMENT'S USE AND ACQUISITION OF PRIVILEGED MATERIALS AND FOR OTHER APPROPRIATE RELIEF

The defendant, George Schussel, has moved to suppress the direct and derivative use of certain privileged documents, identified on privilege logs attached as Exhibits "A-C" to his Motion to Suppress Privileged Documents in the Possession of the Prosecution and to Preclude Further Violation of Attorney-Client and Work Product Privilege on the basis of his attorney-client and work product privileges. He has further moved to preclude the prosecution from acquiring additional privileged documents, identified on a privilege log attached as Exhibit "D" which the Government is seeking to acquire from his prior counsel, Edward DeFranceschi.

This Memorandum of Law is filed to set forth the legal contentions upon which the defendant's assertions of privilege are based.

## I. The Attorney-Client and Work Product Privileges

### A. Facts

The IRS served a notice in September of 1997 of its determination to conduct a tax audit on DCI for the tax year 1995. Defendant Schussel was the majority owner of DCI at the time and was its CEO. The audit began on or about October 27, 1997. Within days, a decision was made to retain counsel to represent DCI and its owners Schussel and

Ron Gomes. A meeting was held on or about October 31, 1997 which involved Schussel, Gomes, and attorney Ken Glusman from the law firm of Brown, Rudnick. A follow-up meeting was held on or about November 4, 1997 at the offices of Brown, Rudnick where Schussel and Gomes met with both Glusman and attorney Edward DeFranceschi. Both Glusman and DeFranceschi filed powers of attorney with the IRS to represent DCI in the ongoing audit. DeFranceschi had numerous follow-up meetings with Schussel, with Gomes, and with Diane Reed who was responsible for the accounting and bookkeeping at DCI and who had attended the first days of the audit. DeFranceschi then requested and received documents from Schussel, Gomes and Reed to enable him to provide legal counsel to the company. The audit soon broadened into an examination of the corporate and individual tax returns for the tax year of 1996. Additional powers of attorney were filed by Glusman and DeFranceschi. Additional documents were provided by the individual and corporate clients. The audit ended in April of 1998.

An acceptance of the adjustments was made in May of 1998 by both the company and its owners. The tax representation was both corporate and individual and included tax counsel provided to both Schussel and Gomes and their wives who had filed joint returns for 1995 and 1996. The individual tax counsel involved issues relating to whether the parties should re-file their earlier tax returns and risk self-incrimination. Volumes of documents were sent to the attorneys to assist them in counseling the individuals regarding this legal issue. Drafts of amended returns were prepared but not filed. Additional legal counsel was provided regarding the relationship between the tax issues and an ongoing business-related issue concerning the attempts by the owners to sell either the assets or stock of DCI to several interested buyers.

### B. Attorney-Client Privilege

As the United States Supreme Court has observed, "[t]he attorney-client privilege is the oldest of the privileges for confidential communication known to the common law." Upjohn v. United States, 449 U.S. 387, 389 (1981)(citing 8 John H. Wigmore, Evidence § 2290 (McNaughton rev. 1961)). By eliminating the possibility that communications with their lawyers will be divulged, the privilege encourages clients to make full disclosure to their attorneys. Id.; In re: Federal Grand Jury Proceedings 89-10, 938 F.2d 1578, 1581 (11th Cir. 1991). Thus, even in the context of confidential communications in civil matters, "the attorney-client privilege is so sacred and so compellingly important that the courts must, within their limits, guard it jealously." Chore-Time Equipment, Inc. v. Big Dutchmen, Inc., 255 F. Supp. 1020, 1021 (W.D. Mich. 1966); accord Seaboard Air Line Rail Co. v. Timmons, 61 So.2d 426 (Fla. 1952) ("The confidential relationship of attorney and client is a sacred one, and one that is indispensable to the administration of justice."); "[T]he sanctity of the attorney-client relationship is one of the cornerstones of our adversary system of justice." United States v. Hernandez, 937 F.2d 1490, 1493 (9th Cir. 1991).

Like nearly every judicial system developed under a common law approach, the federal courts recognize an evidentiary privilege for attorney-client communications. Unlike some jurisdictions where the privilege has been codified, however, the framers of the federal rules of evidence have provided that the privilege "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." Fed. R. Evid. 501.

The essential elements of the attorney-client privilege as developed under the common law are as follows:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

United States v. United Shoe Machinery Corp., 89 F. Supp. 357, 358-9 (D.Mass. 1950).

Although the burden of establishing the existence of the privilege is on the person asserting it, United States v. Bay State Ambulance, 874 F. 2d 20, 28 (1st Cir. 1989), once an attorney-client relationship has been established, communications between an attorney and client are presumed to be privileged, and the opponent of the privilege bears the burden of demonstrating the inapplicability, *i.e.* some exception to the privilege.  See Great American Lines Insurance Co. v. Ace Oil Co., 120 F.R.D. 533, 536 (E.D. Cal. 1988); Cedrone v. Unity Savings Association, 103 F.R.D. 423, 427 (E.D. Pa 1984)("all communications from a client to his/her attorney in a professional contest are presumptively protected"); see generally P. Rice, The Attorney-Client Privilege in the United States §6:31 (1993).

The underlying rationale for the indispensability of the privilege has been at the foundation of the attorney-client relationship:

> "the privilege is established so that clients with concerns about legal matters can communicate about their legal problems without fearing that their communications might subsequently be used as evidence by legal foes…the privilege assures that clients will not create new adverse evidence by talking with their lawyers.  Acceptance of the privilege represents a judgment that it is better to foster communications by creating

a private zone in which clients and lawyers are permitted to talk outside the scrutiny of others than to risk impairment of communications by providing that all communications made by people, including clients' statement to lawyers, are subject to discovery by others and may be used as evidence against the declarants.

Saltzburg, "Communications Falling Within the Attorney-Client Privilege", 66 Iowa Law Review 777, 816-17.

"What the client tells the lawyer about past events is a communication. It qualifies for protection under the attorney-client privilege whether the client writes out a statement, types it on a machine, orally communicates to the lawyer, or dictates the statement into a tape recorder. Whatever the client "says" that relates to the legal services sought will fall within the protection afforded by the most firmly established common-law privilege."

Id. at 814.

## C. Work Product Privilege

Governmental intrusion into attorney work product threatens the very foundation of our criminal justice system. "Our adversarial system of justice cannot function properly unless an attorney is given a zone of privacy within which to prepare the client's case and plan strategy, without undue interference." In re: San Juan DuPont Plaza Hotel Fire Litigation, 859 F.2d 1007, 1014 (1st Cir. 1988). The attorney work-product doctrine recognizes this zone of privacy. In first recognizing the attorney work-product privilege more than fifty years ago, the Supreme Court stated:

In performing his various duties…it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and protect their client's interests. *This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and*

*countless other tangible and intangible ways - - aptly though roughly termed by the Circuit court of Appeals in this case as the "Work product of the lawyer."* Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

Hickman v. Taylor, 329 U.S. 495, 510-11(1947)(emphasis added), see also In re Grand Jury Subpoena, 274 F.3d 563, 574 (1st Cir. 2001). The rationale behind the work-product doctrine applies with even greater force in the criminal context:

Although the work-product privilege most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital. The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case.

United States v. Nobles, 422 U.S. 225, 238 (1975).

So critical is the role played by the work-product privilege that the protection afforded by the privilege survives the termination of the litigation in conjunction with which it was prepared.

*The primary purpose of the work-product privilege is to assure that an attorney is not inhibited in his representation of his client by the fear that his files will be open to scrutiny upon demand of an opposing party. Counsel should be allowed to amass data and commit his opinions and thought processes to writing free of the concern that, at some later date, an opposing party may be entitled to secure any relevant work product documents merely on request and use them against his client.* The work product privilege would be attenuated if it were limited to documents that were prepared in the case for which discovery is sought. What is needed, if we are to remain faithful to the articulated policies of Hickman, is perpetual protection for work product, one that extends beyond the termination of the litigation for which the documents were prepared.

In re Murphy v. United States, 560 F.2d 326, 334 (8th Cir. 1977)(emphasis added); see also FTC v. Grolier, Inc., 462 U.S. 19, 26 (1983)(holding that the work-product created in anticipation of litigation is thereafter protected whether or not related or potential litigation exists); cf. Swidler & Berlin v. United States, 524 U.S. 399, 118 S.Ct. 2081, 2087 (1998)(holding that attorney-client privilege survives death of the client).

## II.    The Government's Receipt of Privileged Materials Provided Without Court Order by Defendant's Prior Counsel Requires Suppression

Because of the importance of the attorney-client relationship, the American Bar Association has promulgated guidelines for its preservation, as reflected in its Standards for Criminal Justice.  In particular, Defense Function Standard 4-3.1 provides that to ensure the privacy of attorney-client communications, *even* prison officials "should be prohibited by law or administrative regulations from examining or otherwise interfering with any communication ... between client and lawyer relating to legal action arising out of charges or incarceration."  The commentary to that standard observes that an intrusion into attorney-client privileged conversations creates "ineradicable prejudice to the defense" and provides that:

> A responsibility rests heavily on the courts, the bar, and law enforcement authorities to see that invasions of the privacy of the lawyer-client relation do not occur.  Law enforcement personnel should be trained ...to respect the vital interest that society has in maintaining that privacy, and appropriate measures should be taken at all levels to see that it is ensured.

Commentary to ABA, Standards for Criminal Justice, Defense Function Standard 4-3.1.[1]

---

[1] The courts have also been quick to criticize the action of law enforcement authorities responsible for the intrusion into the attorney-client conversations. *See, e.g.*, United States v. Ofshe, 817 F.2d at 1516 (suggesting that Assistant United States Attorney responsible for having attorney-client conversations monitored should be brought up on bar charges in his home district).  In the United States v. Noriega, 764 F.Supp. 1480, 1489 (S.D. Fla. 1991), Judge Hoeveler of the Southern District excoriated the government

Since the effect of eliciting confidential information from an attorney is to drive a "chilling wedge" between client and counsel, see United States v. Edgar, 82 F.3d 499, 506 (1st Cir. 1996), the party claiming that an exception applies, must bring the matter before a court for a judicial determination of the applicability of the exception. See id. at 508; cf. U.S. Attorney's Manual §9-2.161(a) (requiring exhaustion of all other sources of information and approval of Assistant Attorney General before the issuance of subpoena to an attorney). To qualify for such an in camera review in a criminal case, the prosecution must demonstrate a sufficient factual basis to lead a reasonable person to believe that the in camera review will lead to the discovery of a factual basis for an exception to the privilege. See United States v. Zolin, 491 U.S. 554 (1989). The party seeking to breach the privilege, as well as the attorney from whom ostensibly privileged information is sought, both have a duty to notify the client, so that the client can exercise his right to intervene in the proceeding to protect his or her privilege. United States v. Edgar, 82 F.3d at 508-09. After all, the privilege belongs to the client, and it is only the client (in consultation with current counsel) who can make the ultimate decision to waive or assert the privilege. Id.[2]:

> "The third line of defense [for the client's attorney-client privilege] is that there will be a disinterested judicial determination of the issue. In United States v. Zolin, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), the Supreme Court set forth the procedure for obtaining judicial review when the attorney-client privilege is consistently asserted and the government opposes the privilege. Id. at 572, 109 S.Ct. at 2631. The government may obtain in camera review of the information alleged to be privileged, at the discretion of the court, upon a "'a showing of a factual basis adequate to support a good faith belief by a reasonable person'...

---

for using a bogus subpoena *duces tectum* to obtain audio tapes of a defendant's telephone conversations with his attorney.

[2] Where the party seeking the privileged information is the prosecution in a criminal case, it has an obligation not to "harangue" the attorney until the attorney capitulates and reveals client confidences. United States v. Edgar, 82 F.3d at 508 & n. 12.

that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies ... *Under Zolin, a prosecutor may not obtain disclosure , or even judicial review, of the privileged information upon a simple assertion that the crime-fraud exception applies, as happened before the grand jury here. See id. at 571, 109 S.Ct. at 2630.*"

Id. at 509[3] (emphasis added)(footnote omitted).

The Government has informed the defense that the defendant's prior counsel, Ed DeFranceschi, through his counsel Elliot D. Lobel, provided the Government with the documents that are identified on the privilege log that is appended as Exhibit "A". Attorney DeFranceschi did not disclose such documents because he determined they were clearly unprivileged. He did not disclose these documents after obtaining a prior judicial order determining they were unprivileged – or that some exception to the privilege applied. He did not even provide his client with notice of his intention to disclose the identified documents. Instead, relying on an ethics rule that permits an attorney to defend himself against an accusation of wrongful conduct, he disclosed them to protect himself without regard to the rights of his client. See Massachusetts Rule of Professional Responsibility 1.6(b)(2) and comment 19A. See also Code of Professional Responsibility DR 4-101(C), (ABA) Model Rule 1.6(b)(2), Application of Friend 411 F.Supp. 776 (SDNY,1975), Meyerhofer v. Empire Fire & Marine Ins. Co., 497 F.2d 1190 (2d Cir. 1974).

Even if the defendant's prior counsel acted within the rules of ethics in offering to disclose privileged documents in defending himself against a federal investigation in which he was designated a target the fact that the prosecution received such documents

---

[3] Dependent on whether there was or was not an 'accusation' against the lawyer, the lawyer may have the right to disclose confidential information to defend himself; the prosecutor, however, should not receive it absent judicial supervision. Id. at n. 11.

without seeking judicial supervision and without the implementation of a Chinese wall was in error, <u>Application of Friend</u>, <u>supra</u> <u>at</u> 777.  Appropriate protective orders should have been sought to preclude the use of the disclosed privileged documents against the defendant, <u>In re: National Mortgage Equity Corporation Mortgage Pool Certificates Securities Litigation,</u> 120 F.R.D. 687, 692 (CD Cal. 1988)(relying on Comment to Model Rule 1.6), <u>see also</u> <u>Bittaker v. Woodford,</u> 331 F.3d 715 (9th Cir. 2003)(reliance by petitioner on privileged documents to prove ineffectiveness of counsel in habeas proceedings does not constitute waiver of petitioner's right to exclude the privileged documents from use against him at a retrial; protective order precluded use in any proceeding except the one for which the disclosure was required).

Even if, *arguendo*, DeFranceschi's disclosure of documents to the prosecution to avoid his own charge was within the ethics rules of self-defense disclosure exception, this disclosure did not in any way constitute an enforceable waiver of the defendant's attorney-client or work product privilege.  See <u>Application of Friend</u>, <u>supra</u>, at 777.  The Government cannot use the disclosed documents directly or derivatively against the defendant even assuming the propriety of prior counsel's disclosures.  The defendant has not waived his privilege with prior counsel.  He is as entitled to the full protection of the privilege as he would be had the government not targeted his attorney for investigation.

Additionally, an e-mail identified on a privilege log, Appendix "C" was acquired by the government from an ex-employee of DCI named Darlene Flint in 2001.  Flint is currently seeking a reward for her providing property which she stole without authority from DCI.  Included in the materials she provided the government was a clearly

privileged document that reflected legal advice given to the defendant, a majority owner
of DCI and Ron Gomes, a minority owner. Its suppression is required.

### III.   ATTACHMENT "A" - Privileges as applied to documents disclosed to the prosecution by prior counsel Edward DeFranceschi

1.  Documents 1, 2, 3, 5, 6, 7, 9, 10, 11and 12 constitute communications from a
client to an attorney regarding facts that were material to the attorney's providing of legal
services or, more specifically, as to documents 2, 3, 5, 6, 7 and 9 for assistance in a legal
proceeding, and as to documents 1, 10, 11, and 12 for the purpose of securing an opinion
of law. All were communicated in writing, without the presence of strangers, and in a
manner that indicated that Schussel reasonably understood that his expectation of privacy
and confidentiality would be protected, see Kevlick v. Goldstein, 724 F.2d 844, 849 (1st
Cir. 1984). For instance, document 1 begins with Schussel writing to his attorney and
stating: "a question of law and regulation follows" which is then particularized with a
request from a taxpayer to an attorney regarding whether he should re-file his personal
federal tax returns. The document, sent by fax, is titled "PRIVILEDGED{sic}
COMMUNICATION FOR Edward DeFranceschi". Document 2 reflects a client's
review of a letter sent by his attorney to the IRS. Document 3 is a client's proposed draft
response to an IRS request for information with a request that the attorney "call...today
with your reactions to the attached. I also have a couple of questions for you" clearly
indicating that the attorney and client are engaged in a confidential exchange of
information rather than a transfer of documents that the client intends for the IRS to
receive in the form transmitted. Drafts are confidential whether authored by the attorney
as work product or the client who transfers it to the attorney as part of his attorney-client
communications. Similarly, document 5 begins with the client writing to his lawyer "a

note for you to use *when and if* appropriate" (emphasis added) again reflecting that the client is providing information to the lawyer rather than using the lawyer as a conduit to disclose such information to third parties.

2. Documents 10 and 11 reflect the client transmitting information and documents to his attorney so that the attorney can provide legal opinions regarding the subject of document 1 – whether the client should re-file his personal income tax returns. The lawyer is a tax specialist and difficult legal issues are raised regarding the necessity and propriety of a client re-filing completed returns following an audit.

3. Document 12 contains the following on the fax page: "CONFIDENTIAL AND PRIVATE INFORMATION FOR ED DEFRANCESCHI. THIS TRANSMISSION COVERED BY ATTORNEY/CLIENT PRIVILEDGE" and the contents reflect a client agenda requesting that the attorney review "the pro's and con's of each of the three alternatives" and indicating the clients concerns for "the self-incrimination aspect" of one of the tax options. Document 12 also reflects the joint and common interests of clients Gomes ("Ron"), his wife ("ML"), Schussel and his wife ("Sandi") in issues concerning the re-filing of joint returns: "Hi Ed: In light of our upcoming meeting on May 6, Sandi, ML, Ron, and I have met and talked through our understanding of some issues remaining. I know that you and {Brown, Rudnick attorney} Ken {Glusman} will have an agenda for the meeting but the purpose of this note is to indicate our agenda."

4. Document 8 is a letter from the attorney to his client relating the attorney's opinion regarding the basis of the adjustments made by the IRS *i.e.* the basis of the IRS proposal to settle the audits for which the attorney was retained. The document also

includes a request for further information which generates document 11. Document 8 is a classic confidential attorney-client communication.

5. Document 4 is a letter from the attorney to his client attached to a fax letterhead reflecting that "THIS FACSIMILE IS CONFIDENTIAL AND PRIVILEGED" and containing a draft of what the attorney is preparing to send to the IRS in response to a request for the attorney to answer certain inquiries arguably relevant to the audit. Although the final letter prepared and sent by the attorney to the IRS is not privileged *i.e.* it is a document that is not private, drafts are private and within the heartland of the attorney-client privilege.

6. Document 13 is the working drafts of the attorney who is preparing possible amended returns for his individual clients the Schussels' and the Gomes'. Drafts are privileged although any return that is completed and filed is not. The drafts were prepared in May of 1998 *i.e.* before the conference the agenda for which is discussed in document 12.

## IV.   The Disclosure of Privileged Documents to the Government by a member of a Joint Defense Agreement is improper and requires suppression.

### A.   Facts

An IRS criminal investigation targeted Ronald Gomes who was the President of DCI from 1991-2001. CEO Gomes elected to cooperate in November of 2002. He executed proffer agreements and provided the Government with a vast universe of documents some of which are clearly privileged and are identified on a privilege log, Appendix "B".

The documents in question were generated by a joint and common interest defense where the defendant, Gomes, and DCI retained common attorneys to represent

them in regards to a specific subject – the 1997-1998 IRS audit and a concomitant

determination whether the individuals should amend and re-file their prior tax returns.

The joint defense was not open-ended nor the subject of an amorphous long-standing

non-litigation specific agreement, compare In Re Grand Jury Subpoena, MBD 01– MC–

1–120 (2001) affirmed 274 F.3d 563 (1st Cir. 2002):

> "After all, a primary requirement of a joint defense agreement is that there
> be something against which to defend. Bay State Ambul., 874 F.2d at 28.
> In other words, a joint defense agreement may be formed only with
> respect to the subject of potential or actual litigation. Polycast Tech. Corp.
> v. Uniroyal, Inc., 125 F.R.D. 47, 50 (S.D.N.Y. 1989)."

Id. at 575.  Instead it was triggered in October 1997 by notice of the IRS that an audit was

to be conducted and it continued through July of 1998 when meetings were held within

two months of the acceptance of the audit adjustments to determine whether amended

1040 returns would be filed by the individuals who were audited, the defendant and

Gomes.

**B.    Joint and Common Interest Agreement Bars Disclosure of Documents
that resulted from Joint Consultation and Representation**

In United States v. Bay State Ambulance, 874 F.2d 20 (1st Cir. 1989), the First

Circuit explained that:

> [i]n order to establish the existence of a joint defense privilege, the party
> asserting the privilege must show that (1) the communications were made
> in the course of a joint defense effort, (2) the statements were designed to
> further the effort, and (3) the privilege has not been waived.

Id. at 28 (quoting In re Bevill, Bresler & Shulman Asset Mgmt. Corp., 805 F.2d 120, 126

(3d Cir. 1986)).

Where the attorney-client privilege is held jointly by two clients, the privilege

cannot be waived without the consent of both clients.  See, e.g., In re Grand Jury

Subpoenas, 902 F.2d 244, 245 and 248 (4th Cir. 1990)(when corporation and its subsidiary had engaged in joint defense of prior litigation, court quashed grand jury subpoena against subsidiary seeking privileged material, even though subsidiary had waived all of its privileges, because corporation has not waived its privileges).

For years it has been well established that "a joint defense agreement cannot be waived without the consent of *all* parties to the privilege" since allowing unilateral waiver "would whittle away" the privilege." United States v. Weissman, 1996 WL 737042 at 26 (S.D.N.Y. Dec. 26, 1996)(emphasis added); In the Matter of Grand jury Subpoena Duces Tectum Dated November 16, 1994, 406 F.Supp. 381, 394 (S.D.N.Y. 1975). Further, a waiver by one party to a joint defense agreement does not waive any other party's privilege over the same communications." Securities Investor Protection Corp. v. Stratton Oakmont., Inc., 213 B.R. 433, 436 (S.D.N.Y. 1997).

The fact that the attorneys represented the parties jointly rather than individual attorneys representing individual defendants does not change the rights to be accorded the defendant:

> The common interest privilege protects communications between a lawyer and two or more clients regarding a matter of common interest. See In re Auclair, 961 F.2d 65, 69 (5th Cir. 1992)(privilege applies if "persons ... consult with an attorney together as a group with common interests seeking common representation"); 1 Scott N. Stone & Robert K. Taylor, Testimonial Privileges § 1.21, at 1-54 (2d ed. 1993)("Where the same attorney represents two or more clients having a common interest, confidential communications made by those clients to the common lawyer will be protected from disclosure to third parties."); 8 John H. Wigmore Evidence §2328, at 639 (McNaughton Rev. 1961) ('Where the consultation was held by clients jointly, the waiver should be joint for joint statements, and neither could waive for the disclosure of the other's statements; yet neither should be able to obstruct the other in the disclosure of the latter's own statements.")

In re Sealed Case, 29 F.3d 715, 719 (DC Cir. 1994)

## V.   Gomes has no authority to waive the corporate attorney client or work product privileges of DCI

Although Gomes was the President of DCI until 2001, he was only a 5% owner. Defendant Schussel owned 95% of the company, purchased Gomes' 5%, and, with his family owned 100% of DCI and its successor entities at all times after 2001. Control of DCI and its successor companies was clearly in the hands of defendant Schussel. Just as Schussel has never waived his individual attorney-client privilege, he has also never waived the corporate privilege of DCI.

It is well-established that a valid, intentional waiver of a corporation's attorney-client privilege can only be accomplished by the person or entity in *current* control of the corporation or the corporation's successor in interest. Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 349 & n. 5 (1985). Because the privilege belongs to the corporate entity, and not to the individual officers or directors, control of the privilege extends to communications made by previous management, because all communications with corporate counsel are made on behalf of the corporate entity. Moreover, former employees cannot waive a corporation's attorney-client privilege. See Sprague v. Thorn Americas, Inc., 129 F.3d 1355 (10th Cir. 1997).

Gomes had no right to disclose documents protected by a corporate privilege. Neither DCI nor its successor corporations consented to Gomes' providing of documents to the Government. Neither DCI nor its successor corporations derived any benefit from Gomes' disclosures. Gomes made the disclosures as part of an attempt as an individual to exchange his cooperation for personal benefits. His conduct is not attributable to the corporation and does not constitute a waiver of any corporate privilege. In re Grand Jury Proceedings, (U.S. v. Doe) 219 F.3d 175, 186-7 (2d Cir, 2000).

VI.    **ATTACHMENT "B' - Privileges as applied to documents disclosed to Government by Ronald Gomes**

1. Documents 1, 4, and 5 are each legal memoranda, authored by attorneys John Zampino or Harold Silverman, each addressed to the defendant George Schussel, each confidential in nature, each providing legal opinions regarding the validity of certain tax and business strategies, each relating to DCI, a company Schussel was the principal owner and Ron Gomes was a minority owner and President as of the time, 1995, when the memoranda were authored and transmitted. Schussel gave each memoranda to Gomes because they related to their corporation, its structure (*see* document 4), its tax obligations regarding its international operations (see documents 1 and 5). To the extent they resulted from corporate representation, control of the corporate privilege is possessed by Schussel who purchased Gomes' interest in February of 2001. Schussel has never waived either his individual or corporate privilege. The documents were created for the corporation and/or for Schussel. Gomes had no right, given the privileged nature of each document (*e.g.* the document 1 heading "This Memorandum is Protected by the Attorney/Client Privilege") to disclose them to the prosecution as part of his cooperation and concomitantly the prosecution had an obligation not to review its contents. Each are protected by both the attorney-client privilege and opinion work product privilege of both attorney and client neither of which has been waived.

2. Documents 2 and 3 relate to Document 1. Schussel faxes the legal memorandum authored for DCI and himself to his daughter, an MIT Sloan School graduate and employee of DCI for her to interpret. Document 2 is her summary of document 1. Document 3 is a faxed copy of the legal memorandum of attorney Zampino. Document 1 and 3 do not lose their privileged protection because they were shared by Schussel with

his daughter, <u>United States v. Stewart,</u> 287 F. Supp 2d 461, 468-9 (S.D.N.Y. 2003)[4].

Document 2 is privileged because Stacey Griffin is acting as an intermediary between

attorney Zampino and her father. It is further privileged because DCI could delegate to

Stacy Griffin the responsibility as an employee of DCI to receive and summarize

corporate legal advice, <u>Upjohn v. United States</u>, 449 U.S. 383, 393-5, 101 S.Ct. 677, 684-

5 (1981). Document 2 begins with the statement that "following is a translation of the

general rules regarding foreign corporations as we received from John Zampino" and

concludes with a section styled "Questions for Zampino". The document is authored for

Schussel, Gomes, and Reed – three employees of DCI who would be involved in any

decision as to how DCI could lawfully benefit from the use of a foreign corporation.

3. Document 6 contains a note authored by Gomes indicating that other papers

constitute notes from a meeting "in the library looks like {attorney} Ken Glusman in

those meetings".[5]  The papers to which he refers is document 7, dated May 6, 1996,[6]

which addresses the legal issue of whether DCI or its owners Schussel or Gomes should

re-file corporate or individual tax returns. The notes reflect an attorney-client meeting

attended by Ken Glusman, a tax attorney from Brown, Rudnick. The notes also reflect

---

[4] "Most courts that have analyzed the question whether a party has waived work product protection over documents by disclosing them to third parties have found waiver only when the disclosure "substantially increased the opportunities for potential adversaries to obtain the information." Thus, courts have found parties to have waived protection of the doctrine by voluntarily submitting documents to potential adversaries such as government agencies. Courts have also decided that by disclosing work product to an adversary in one case, parties waive protection in future cases against different adversaries. However, the sharing of litigation materials among nonadversarial parties such as co-plaintiffs, or among parties opposing the same adversary in different proceedings, has been held not to constitute waiver. This approach recognizes that the purpose of the work product doctrine "is to protect material from an opposing party in litigation, not necessarily from the rest of the world generally." The doctrine's concerns are not implicated by a disclosure that does not increase the risk of adversarial intrusion into an attorney's "zone of privacy", thus, such disclosures should not be viewed as waiving the protection. Phrased in terms of the intent driving the disclosure, because the doctrine protects only against disclosure to adversaries, "[d]isclosure to third persons in no way indicates a party's intent to allow his adversary access to work product materials; waiver is therefore not warranted." <u>Id</u>. at 468-9 (citations omitted).

[5] The rest of document is not privileged.
[6] The correct date may be May 6, 1998.

legal assessments regarding a potential sale of the stock or assets of DCI and its relationship to the tax issues such as the "statute of limits". Gomes' notes of a joint attorney-client meeting with attorney Glusman are privileged and Gomes cannot waive that privilege for Schussel since the privilege is both (a) a corporate privilege controlled by Schussel and (b) a common interest individual privilege requiring the waiver of both clients before the confidential conversations at a joint defense meeting are waivable.

4. Document 8 is a legal memorandum labeled "Personal And Confidential Subject To Attorney-Client Privilege" authored by Attorney Glusman, addressed to Schussel and Gomes, relating to "Planning for Tax Issues in Sale of Business". Again, the privilege is both corporate thus controlled and not waived by Schussel and a common interest privilege of both owners that can only be waived by the joint consent of both clients. Additionally, it is the opinion work product of Glusman and the clients and neither the attorney nor Schussel have waived the work product privilege. The memo is annotated with notes reflecting the legal advice of Ken {Glusman} and Ed { DeFranceschi } and further reflecting that legal opinions were given to clients seeking professional advice regarding the complex tax implications of a sale of a business.

5. Documents 9-11 are notes of Gomes that are generated by attorney-client joint meetings with attorneys Glussman and Ed {DeFranceschi }. The "summary of advice", document 9, clearly reflects Gomes' notes of the joint defense meeting of July 28 that is the subject of the memoranda, document 8. It outlines the advice of each attorney. The advice was provided to Schussel and Gomes jointly and to DCI. Gomes cannot unilaterally waive neither Schussel's individual privilege nor DCI's corporate privilege. The notes are the memorialization of joint legal advice and remain privileged.

6. Document 12 is Schussel's attorney-client communication to DeFranceschi on behalf of Gomes, his wife and Schussel and his wife in preparation for the May 6 meeting that is referred to in document7, supra. It is as protected as if Schussel spoke the words in a common interest meeting with attorneys jointly representing he and Gomes in reference to their related tax issues and in particular their joint issue as to whether to re-file individual returns. A copy of this document was sent to Ken Glusman further indicating the privileged nature of the letter and its being an unambiguous request for legal advice.

## VII.    The Documents in the 4 Privilege Logs "A-D" are not documents created by a client or an attorney with the intent to disclose to the IRS or Government

The documents identified in exhibits "A-D" were not created with the intention that they would be disclosed to the Government. Each and every document remains privileged despite the fact that DeFranceschi was retained to represent the defendant and his company in an IRS audit and received documents and information in order to provide effective representation regarding the audit. To deprive the defendant of the confidentiality necessary to make disclosures and share information with an attorney just because the attorney would be speaking to the defendant's adversary (as a criminal defense attorney speaks to prosecutors regarding many subjects including, on occasion, the option of negotiating a plea) would negate the soul of the privilege. The exception is narrow: if a document is created to give to the government then it is not privileged. If information is given to the lawyer by a client who has actual knowledge that the lawyer will act as a conduit of the information to the client's adversary then it is not privileged. All other confidential communications remain protected, see generally United States v. White, 970 F.2d 328 (7th Cir 1992).

**VIII.    The Documents in the attached Privilege Logs "A – D" were not created to further a crime or fraud and thus remain privileged from disclosure to the prosecution**

The burden is squarely on the prosecution to invoke any crime/fraud exception to the privilege. <u>United States v. Reeder</u>, 170 F.3d 93 ,106 (1st Cir. 1999)(prima facie showing required that attorney's assistance was sought in order to further a crime or fraud before document can be exempted from privilege):

> The importance and sanctity of the attorney-client privilege is well established. <u>See</u> <u>Upjohn v. United States</u>, 449 U.S. 383 (1981). Because it "'withhold[s] relevant information from the factfinder,'" <u>United States v. Zolin</u>, 491 U.S. 554, 562 (1989)(citation omitted), the "'attorney-client privilege does not apply where the client consults an attorney to further a crime or fraud.'" <u>Motley v. Marathon Oil Company, Inc.</u>, 71 F.3d 1547, 1551 (10th Cir. 1995)(quoting <u>In re Grand Jury Proceedings (Company X)</u>, 857 F.2d 710, 712 (10th Cir. 1988)). "It is the purpose of the crime fraud exception to the attorney-client privilege to assure that the "seal of secrecy,'" between lawyer and client does not extend to communications "made for the purpose of getting advice for the commission of fraud' or crime." <u>Zolin</u> 491 U.S. at 563 (citations omitted). "Thus, <u>the attorney-client privilege is forfeited</u> inter alia <u>where the client sought the services of the lawyer to enable or aid the client to commit what the client knew or reasonably should have known to be a crime of fraud.</u>" <u>United States v. Rakes</u>, 136 F.3d 1, 4 (1st Cir. 1998)(emphasis added).
>
> <u>Id</u>. at 106.

First, the defendant contends that neither DeFranceschi nor Glusman, the attorneys in question, were hired to further a crime. They were retained in the fall of 1997 in relation to an audit relating to tax years 1995 and 1996. Corporate and individual returns had been filed for each year in question before either attorney were retained. As to the audit, the defendant denies he intended to commit a crime or fraud, denies he did commit a crime or fraud, and denies that the services of either attorney were sought to enable him to commit a crime or fraud. <u>Compare</u> <u>United States v. Reeder</u>, <u>supra</u> at 107

(court finds exception to privilege <u>only</u> upon proof that client twice asked attorney for

"help in a cover-up of [client's] fraudulent diversion of insurance funds").

      Second, *assuming arguendo* the commission of a tax offense prior to the retaining

of either attorney, the post-offense communications about an earlier alleged offense are

completely protected and outside any crime or fraud exception:

> "[T]he attorney-client privilege protects communications rather than
> information ...Thus, although communications otherwise covered by the
> attorney-client privilege lose their privileged status when used to further a
> crime or fraud, post crime repetition or discussion of such earlier
> communications, made in confidence to an attorney, may still be
> privileged even though those earlier communications were not privileged
> because of the crime-fraud exception.  In other words, it is generally the
> context rather than the content of a communication that allows invocation
> of the attorney-client privilege. . .
>
> Applying the government's "mere memorialization" approach, a client,
> once he committed a crime or fraud furthered by earlier communications
> with counsel, could never again engage in full and frank discussion with
> counsel regarding the past crime or fraud.

<u>In re Federal Grand Jury Proceedings 89-10</u>, (MIA) 938 F.2d 1578, 1582 (11th Cir. 1991).

      Third, the fact any identified document might, in the government's view, provide

the government with evidence of an alleged crime is not sufficient to pierce the work

product privilege.  Such a possibility does not mean that the reports were themselves

created in *furtherance of or closely related to* the alleged crime.  <u>In re Federal Grand Jury</u>

<u>Proceedings 89-10 (MIA)</u>, 938 F.2d at 1581; <u>see also</u> <u>Cox</u>, 17 F.3d at 1422 ("Even if the

Union engaged in an effort to conceal the unlawful activities of its negotiators ... after

our own <u>in camera</u> inspection, we agree with the district court that the documents in

question were not created to further any crime or fraud; nor are they closely related to

any.") <u>In Re Richard Roe</u>, 68 F.3d 38, 40 (2d Cir. 1995)("Instead, the exception applies

only when the court determines that the client communication or attorney work product

in question was *itself* in furtherance of the crime or fraud.")(emphasis added). Indeed,

courts have rejected the "relevant evidence" test as a basis for finding crime-fraud,

reasoning that under such a test the exception would completely swallow the rule. In re

Richard Roe, 68 F.3d at 40, remanded then reversed on other grounds, 168 F.3d 69 (2d

Cir. 1999)(under the "relevant evidence" test, "the privilege would be virtually

worthless").

> The crime-fraud exception has a precise focus: It applies only
> when the communications between the client and his lawyer further a
> crime, fraud or other misconduct. It does not suffice that the
> communications may be related to a crime. To subject the attorney-client
> communications to disclosure, they must actually have been made with an
> intent to further an unlawful act.

United States v. White, 887 F.2d 267, 271 (DC Cir. 1989).

*Assuming arguendo* there was a crime or fraud in 1997-8, the test for when a

document loses its privileged status is not dependent on its relevance to the crime or

fraud, instead, the test, far narrower, is whether a particular document was created to

further the crime or fraud.

## IX.    ATTACHMENT "C" – The Attorney E-mail Identified in the Privilege Log Should be Suppressed

Document 1 on attachment "C" was provided to the Government by Darlene

Flint. It was acquired by her without authority from her employers Gomes and Schussel.

It reflects a confidential communication transmitted by Attorney Glusman to Schussel,

his client, and then by Schussel to Gomes who was jointly represented by Glusman

regarding tax issues that were of common concern to both Schussel and Gomes. The

contents of the e-mail clearly reflect the providing of legal advice. The e-mail refers to

legal opinions of two other attorneys for Schussel, Gomes and DCI, Abigail Hechtman of

Brown, Rudnick who was working on the sale of DCI, and Ed DeFranceschi who was working with Glusman on the tax implications of the sale and the related issue of the re-filing/amending of prior individual tax returns. The theft of privileged communications does not constitute a voluntary waiver of the attorney-client privilege or opinion work product privilege. Additionally, Attorney Glusman has not waived his opinion work product privilege. The documents must be suppressed.

X.   **ATTACHMENT "D" – Privilege Log Identifying Documents in Defendant Schussel's Prior Attorney's Files that the Government is Seeking to Acquire that are Protected from Disclosure by the Attorney-client or Work-product Privileges**

Post-indictment, the Government has advised counsel for Schussel and counsel for his prior counsel DeFranceschi that they intended to subpoena, pretrial, the entirety of DeFranceschi's files. Counsel for DeFranchesci reviewed the files and disseminated an index to both the Government and to counsel for Schussel. He also provided copies of the documents to Schussel. Schussel's counsel has numbered the documents and asserted either an attorney-client or work product privilege when appropriate. The Government has not made a filing that would even minimally conform to the requirements of United States v. Zolin, supra, and warrant an in camera review of the documents to which a privileged has been claimed.

Certain of the documents are facially and incontestably privileged such as the documents reflecting communications from Schussel to his lawyer, the documents reflecting communications from DeFranceschi to Schussel, and the documents reflecting the opinions, impressions, analysis, drafts and traditional work product of DeFranceschi. Importantly, DeFranceschi was not a tax preparer. The tax returns in question, both corporate and individual, were prepared by accountant Paul Law and filed before

DeFranceschi was retained to represent Schussel and DCI in a tax audit and to provide legal counsel regarding a variety of tax issues including the decision whether to re-file and amend earlier returns. Information transmitted to DeFranceschi was intended by Schussel to be used to assist in the legal representation function – and is not outside the privilege as it would be if DeFranceschi was acting as a tax preparer. See In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1037-8 (2d Cir. 1984), see, generally, United States v. Frederick, 182 F.3d 496, 500-501 (7th Cir. 1999).

Other documents, including many labeled "FWP" for fact work product, were documents that preexisted the legal representation but were produced by the defendant or DCI at the instruction of the lawyer to assist the lawyer in rendering legal representation and giving opinions of law. As such, the documents can be subpoenaed from other entities (and already have e.g. Northmark Bank records and the Bank of Bermuda records) but may not be subpoenaed from the attorney because they reflect the lawyer's mental impressions. The "selection process of defense counsel in grouping certain documents together out of the thousands produced…is work product entitled to protection under Federal Rule of Civil Procedure 26(b)(3) and the principles of Hickman v. Taylor,{cite omitted}" Sporck v. Peil, 739 F.2d 312,315 (3d Cir. 1985).

Given the Department of Justice's own mandate that lawyers should be subpoenaed – even for documents – only when there is no other available source, supra at p. 8, the Government should withdraw its request for preexisting documents that would evidence counsel's selection and thought process and should withdraw the remainder of its request based on the privileges identified in Attachment "D".

XI.  **The Government is Required to Satisfy the 3 Part Test of <u>U.S. v. Nixon</u> in Order to Justify the Request for Pretrial Production of Documents Pursuant to Fed.R.Crim. P. 17(c)**

The Grand Jury's return of an indictment converts the unlimited power of the Government to subpoena documents into a limited and judicially supervised power. Pretrial subpoenas, whether issued by a defendant or a prosecutor, are subject to the requirements of prior judicial authorization pursuant to the relevance, admissibility, and specificity tests of <u>United States v. Nixon</u>, 418 U.S. 683,700, 94 S.Ct.3090, 3103 (1974). The prosecution must meet each of these three tests – as well as additional requirements for a pretrial subpoena of an attorney - before there is any consideration of the privilege issues raised in Attachment "D".   The open-ended request for information certainly is insufficient to meet the specificity test under <u>Nixon</u>. Given the antecedent disclosures from the defendant's prior counsel, any further disclosures are not warranted under the <u>Nixon</u> tests and should be denied.

Respectfully submitted,
BY HIS ATTORNEYS,


Martin G. Weinberg
Mass. Bar No. 51940
20 Park Plaza, Suite 905
Boston, MA 02116
(617) 227 3700

26

*Franey J DiMento Sr.*

Francis J. DiMento, Sr.
DiMento & Sullivan
7 Faneuil Marketplace
Boston, MA 02109
(617) 523 2345

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that I have served one copy of the foregoing motion via-hand delivery upon Carmen Ortiz, Assistant United States Attorney, Moakley United States Courthouse, One Courthouse Way, Boston, MA 02210 on this 15th day of October, 2004.

Martin G. Weinberg

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                                 )
            v.                      )     CRIMINAL NO.  04-10040-RCL
                                 )
GEORGE SCHUSSEL,         )
        Defendant       )
                               )

# EXHIBITS FILED UNDER SEAL