1

I
1 - 69

UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF THE UNITED STATES ATTORNEY

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

VS.                                    Case No.

JOHN DOE.

Federal Grand Jury
U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts

Thursday
January 22, 2004

APPEARANCE:   CARMEN M. ORTIZ
              Assistant U.S. Attorney

WITNESS:      PAUL M. LAW

ORIGINAL

*APEX Reporting*
(617) 426-3077

1    A    No.

2    Q    Pretty much kept out of the loop?

3    A    Completely.

4    Q    Let me ask you a few questions about Jellicle.

5    A    Okay.

6    Q    You said that it's a company that Mr. Schussel
7  runs?

8    A    Yes.

9    Q    It's a real estate company?

10   A    Mm-hm.

11   Q    Tell us exactly what it does?

12   A    Manages -- manages the building in Andover, or it
13 owns the building in Andover where DCI is located, and I
14 believe that some of the expenses for his house in Key West
15 is used in Jellicle, because he maintains an office there,
16 as well.

17   Q    Who owns Jellicle?

18   A    George.  Most of it.  I think he owns 92 percent
19 of it.  He's transferred some stock to his kids, but.

20   Q    What employees does Jellicle have?

21   A    Two.

22   Q    Two employees?

23   A    Yes.

24   Q    Who are those employees?

25   A    I do the payroll.

1    Q    You do the payroll for two employees out at
2  Jellicle; is that correct?
3    A    Yes.
4    Q    Now, one employee is in Florida?
5    A    Yes.
6    Q    One employee is in New Hampshire or Massachusetts?
7    A    I think Massachusetts. Yeah, Massachusetts.
8    Q    What do those employees do?
9    A    I have no idea.
10   Q    How many homes does Mr. Schussel own?
11   A    He owns at least three. Lynnfield, Mass.; Lake
12 Winnipesaukee, New Hampshire, in Meredith or something; and
13 Key West; and he may own -- he may own something else, but
14 I'm trying to think. At least those three.
15   Q    And is his primary residence in Lynnfield, Mass.?
16   A    No. His primary residence is in Florida.
17   Q    What does he claim on his tax return as a
18 residence, though?
19   A    Florida.
20   Q    Florida?
21   A    That's right.
22   Q    Florida? And he owns these three homes that are
23 -- to your knowledge, these are personal homes of his,
24 correct?
25   A    Yes.

*APEX Reporting*
(617) 426-3077

1    Q    The employee in Florida basically runs his home in
2    Florida. Were you aware of that?
3    A    No.
4    Q    What do you think Jellicle is paying a payroll for
5    someone in Florida?
6    A    Well, if I had known you were going to ask me this
7    question, I could have brought it in. I mean, it's not that
8    much. Three- or four-hundred dollars a week, four- or
9    five-hundred dollars a week. That's all.
10   Q    Are these -- these payroll moneys that
11   Mr. Schussel pays out to these individuals, does he deduct
12   them as a business expense of Jellicle?
13   A    Yes, he does.
14   Q    Do you know what these people do?
15   A    No.
16   Q    If they primarily ran his residences, personal
17   residences, is that an appropriate deduction ---
18   A    No.
19   Q    --- to take?
20   A    No.
21   Q    Jellicle runs the management for the mill, which
22   is where DCI operates; is that right?
23   A    Yes.
24   Q    Mr. Schussel owns Jellicle and he owns DCI, and
25   DCI pays Jellicle rent ---

```
 1      A      Yeah.
 2      Q      --- is that right?
 3      A      Yeah.
 4      Q      Rent that DCI then deducts from its income?
 5      A      Right.  And Jellicle reports it.
 6      Q      Jellicle reports it as income?
 7      A      Right.
 8      Q      But then Jellicle deducts these payroll expenses,
        you said; is that right?
10      A      Yes.
11      Q      What else does Jellicle deduct?
12      A      Maintenance of the building, maintenance of the
        building, some of the, some of the expenses in Key West.  I
        don't know about any of the expenses in New Hampshire.  I
        don't think there's anything on Jellicle about that.  That
        I'm not sure.  George and I had the discussion about that.
17      Q      Tell us the discussion you had with respect to
        what Jellicle really does and what he's deducting under the
        Jellicle, for business expenses of Jellicle, what discussion
        did you have?
21      A      Well, that -- claiming these -- you know, claiming
        these as business expenses were -- well, I think I asked him
        -- let me see if I can get this right.  I think at one point
        we had a discussion about some of the Florida expenses and
        so forth and so on, and he maintained to me that that was
```

1  his office down there.
2     Q    His office?
3     A    His -- right. His -- he had an office down there
4  in his house in Key West, and he was working out of there,
5  and like one-third of it was used for business.
6     Q    One-third of it was used for business?
7     A    I think one-third. I'm ---
8     Q    Have you been deducting -- has he had you deduct
9  these business expenses over the last several years for
10 Jellicle?
11    A    To the best of my knowledge, yes.
12    Q    And he's claiming that he's running business out
13 of there?
14    A    Yes.
15    Q    Out of an office in that home?
16    A    Yeah, I think so.
17    Q    Okay. Have you ever visited the Florida
18 residence?
19    A    No.
20    Q    Do you know what he uses it for?
21    A    Well, he lives there, certainly.
22    Q    He lives there ---
23    A    Right.
24    Q    --- a good chunk of the winter; isn't that
25 correct?

1    A    Well, I don't really -- I mean, I don't really
2    know.  I know he's back and forth quite a, quite a bit.
3    Q    And his children use it to vacation, don't they?
4    A    I've heard that.
5    Q    And he had his daughter's wedding there, didn't
6    he?
7    A    Don't know.
8    Q    You weren't invited to the wedding?
9    A    I wasn't invited to the wedding.
10   Q    What other expenses does he deduct on the Jellicle
11   for Florida?
12   A    Well, as I say, I think it's like a portion of the
13   household expenses.  Like the utilities and ---
14   Q    Phone bill?
15   A    Phone bill.  I mean, the phone bill ---
16   Q    Landscaping?  Gardening?  Housekeeper?
17   A    Probably.
18   Q    Housekeeper?
19   A    I don't know.
20   Q    He deducts the employee in Florida 100 percent;
21   isn't that correct, what he pays that employee?
22   A    Debra Burns.
23   Q    Debra Burns?
24   A    Right.  Right.
25   Q    And he deducts the other Massachusetts employee?

*APEX Reporting*
(617) 426-3077

1   A   Yes.

2   Q   Is that right?

3   A   Yes.

4   Q   Do you know whether or not that person maintains
5   his private home in New Hampshire and in Lynnfield,
6   Massachusetts?

7   A   Say that again.

8   Q   That that employee -- do you know the name of that
9   employee?

10  A   Well, I do, but I just can't remember it off the
11  top of my head.  Is it County?  Is it ---

12  Q   Susan?  Suzanne?

13  A   No, no.  There's -- no.  One's a guy and one's a
14  girl on Jellicle.  The girl is Debra Burns and the guy is --
15  James McConnell?  Is that the guy's name?  I think it is.

16  Q   Possibly.  I'm not ---

17  A   Yeah.  Well, anyways.

18  Q   If these individuals primarily run the house, make
19  sure things are running properly and house clean ---

20  A   Sure.

21  Q   --- for Mr. Schussel's personal residences, those
22  are not ---

23  A   Legitimate.

24  Q   --- legitimate deductions; is that correct?

25  A   That's correct.


APEX Reporting
(617) 426-3077

1    Q    Business deductions?

2    A    That's correct.

3    Q    And do you know if you deduct utilities and the
4  phone expenses and other expenses associated with his New
5  Hampshire residence?

6    A    I don't know.

7    Q    You don't know?

8    A    About New Hampshire, no.

9    Q    What about in Lynnfield, Mass.?

10   A    I don't -- I don't know, but I don't think so.  I
11 think he deducts -- I think Jellicle has to do with the mill
12 in Andover and his house in Key West, and he maintains an
13 office -- this is the way it was explained to me, he
14 maintains an office in Key West, and there were certain
15 expenses.  You know, like if the utility bill say is, you
16 know, just to keep it simple, $3,000 a month, and if he's
17 claiming one-third of his house is used for business, then
18 he would claim $1,000.

19   Q    Well, Mr. Law, did you tell him that when you run
20 an office out of your home, that there are certain things
21 that you have to do to make sure that it is really kept
22 separate and it operates as a business?

23   A    I probably did.  I -- I don't remember that
24 specific conversation, but again, this is an area where I've
25 discussed this issue with many, many, many people over the

1   years, and I always tell them the same thing.
2       Q   Well, let's focus on Mr. Schussel.
3       A   Yeah.
4       Q   And what his reaction was when you -- did you
5   elaborate into what he needed to do in order to maintain it
6   as a business?
7       A   Did I elaborate?  I -- I don't recall.  I -- I
8   might have said -- mm.  I don't recall.
9       Q   Let me ask you this:  Do you know exactly all of
10  the expenses that you're deducting for Jellicle and the
11  bases for those expenses?
12      A   No.
13      Q   You're relying on a summary?
14      A   Yes.
15      Q   Are you not?
16      A   Yes.  Absolutely.
17      Q   And whose summary are you relying on?
18      A   Well, that summary is provided by Jane, Jane
19  Lawler (phonetic).
20      Q   Jane Lawler is Mr. Schussel private assistant?
21      A   I'm not sure exactly what the term is, but she
22  handles -- my understanding is, is that she does some work
23  for DCI and she may handle paying the bills or something for
24  Jellicle.  But I -- I send the payroll for Jellicle to her.
25      Q   Now, if Mr. Schussel were asked -- if he is

1   deducting, under Jellicle guise, as business expenses, all
2   really personal expenses, could he say, well, I did this
3   because my accountant advised me I could do it, as long as I
4   said it was an office?  Could he claim that?
5       A   No.  I don't think so.
6       Q   Why not?
7       A   Well, if I had explained to him that an office has
8   to be used, an office in the home, primarily and exclusively
9   for business, and you must regularly do the work there,
10  et cetera, et cetera, et cetera, so I may have explained
11  that to him.  Then if -- now I'm just speculating here, but
12  if it was his understanding that he qualified for that, then
13  maybe he was basing that -- basing his decision on what I
14  told him.
15      Q   Let me ask you this:  Do you think or you just
16  don't know if he's claiming a third office in Florida and
17  Lynnfield and New Hampshire?
18      A   I don't know.
19      Q   And you don't know what these people are doing
20  that you're paying -- doing the payroll for ---
21      A   No.
22      Q   --- is that correct?
23      A   I don't.
24      Q   You've never asked Mr. Schussel?
25      A   No.

*APEX Reporting*
(617) 426-3077

1   Q   What they specifically do for him?

2   A   No.

3   Q   Now, is there anything else that you deduct for
4   Jellicle that we haven't talked about, other than the
5   utilities, the phone bills, the payroll expenses for these
6   two people?

7   A   Not to my recollection.

8   Q   Do you retain copies of the tax returns that
9   you've prepared for Mr. Schussel within the last several
10  years?

11  A   Just three.

12  Q   Just the last three years?

13  A   For all of my clients.

14  Q   For all your clients?

15  A   For all my clients.  Just ---

16  Q   Okay.  So Mr. ---

17  A   --- because of storage.  I don't have room to keep
18  them all so ---

19  Q   Okay.

20  A   --- I shred them.

21  Q   So directing your attention to Mr. Schussel, in
22  Mr. Schussel's case, you would have the tax returns that you
23  prepared and were filed with the IRS for the last
24  three years?

25  A   Yes.  Maybe four.  Maybe.

1   Q   Maybe four?

2   A   Maybe four.

3   Q   Would you also have the summaries that were
4   prepared for you?

5   A   I may, I may not. Some times I mail them back.

6   Q   Okay. I'm going to ask you, after you are done
7   with your testimony, to ---

8   A   Check.

9   Q   --- look for that information ---

10  A   Okay.

11  Q   --- and provide it to us.

12  A   All right.

13  Q   To the Grand Jury.

14  A   Not a problem.

15  Q   Have you had discussions with Mr. Schussel
16  regarding this investigation?

17  A   Yes.

18  Q   Can you tell us what discussions you've had with
19  him?

20  A   I told him that I was served a subpoena and what
21  they asked for, and my meeting with Mr. Harriman and, as I
22  told you, I called him yesterday and told him I was coming
23  in here today.

24  Q   Let me ask you this: Prior to telling him about
25  the Grand Jury subpoena ---