UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO.  04-10060-RCL |
| GEORGE SCHUSSEL, | ) | |
| Defendant | ) | |
| | ) | |

**<u>UNITED STATES' TRIAL BRIEF</u>**

The United States submits this trial brief in advance of the trial scheduled for this matter

on January 8, 2007.  This brief sets forth the statutory basis of the offenses charged and a

summary of the United States' expected evidence.  This trial brief also discusses a few of the

legal issues that may be raised during the course of the trial.

**A.     The Statutory Basis of the Charges**

The defendant in this case, George Schussel ("Schussel" or the "Defendant"), has been

charged in a three-count indictment alleging conspiracy to commit tax evasion, in violation of 18

U.S.C. § 371, and tax evasion, in violation of 26 U.S.C. § 7201.

**1.     Count One: Conspiracy.**

Count One charges a violation of 18 U.S.C. § 371, which provides, in pertinent part,

> If two or more persons conspire . . . to defraud the United States,
> or any agency thereof in any manner or for any purpose, and one
> or more of such persons do any act to effect the object of the
> conspiracy, each shall be ...[guilty of a criminal offense].

In this case, the particular type of conspiracy charged under § 371 is known as a <u>Klein</u>

conspiracy.  <u>See</u> <u>United States v. Klein</u>, 247 F.2d 908 (2d Cir. 1957).  In such a conspiracy, the

United States alleges the defendant conspired to defraud the United States for the purpose of

"impeding, impairing, obstructing and defeating" lawful government functions of the Internal

Revenue Service ("IRS") in the "collection of revenue; to wit, income taxes." Id. 247 F.2d at

915.  To prove a violation of § 371 in this context, the United States must prove three elements:

> (1)    that the agreement specified in the indictment existed between two or more people, to impede, impair, obstruct, and defeat the lawful government function of the Internal Revenue Service in the ascertainment, computation, assessment and collection of federal taxes;
>
> (2)    that the defendant knowingly and willfully joined in the agreement; and
>
> (3)    that one of the conspirators committed at least one overt act in an effort to further the purpose of the conspiracy.

See, for example, L. Sand, et al, Modern Federal Jury Instructions: Criminal, ¶ 19.02, Inst. No.

19-12 (2004); First Circuit Pattern Jury Instructions (Criminal) 4.03 (1998).

### 2.    Counts Two and Three: Tax Evasion.

Counts Two and Three charge Schussel with violations of 26 U.S.C. § 7201 in

connection with the tax year 1995.  Count Two specifically charges Schussel with a violation of

§ 7201 in connection with tax evasion by his company, Digital Consulting, Inc. ("DCI"), for the

tax year 1995.  Count Three charges Schussel with a violation of § 7201 in connection with his

personal taxes for the tax year 1995.  Section 7201 provides, in pertinent part:

> Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony. . . .

26 U.S.C. § 7201.  To prove a violation of this statute, the United States must show "(1) the

existence of a tax deficiency, (2) an affirmative act constituting an evasion or attempted evasion

of the tax, and (3) willfulness."  United States v. Lavoie, 433 F.3d 95, 97 (1st Cir. 2005) (citing

Sansone v. United States, 380 U.S. 343, 351, 85 S.Ct. 1004 (1965) and 26 U.S.C. § 7201).

**B.     Summary of the Evidence**

    **1.     Background.**

In 1982, Schussel started DCI, a  company that organized and conducted computer based training seminars, trade shows, and conferences for businesses in the computer industry.  At all times relevant to the charges, Schussel was the principal shareholder and chief executive of DCI. During most of the time frame relevant to the charges, Schussel owned 95% of DCI.  Ronald Gomes ("Gomes"), who joined Schussel shortly after the company started and eventually became President of DCI, owned the other 5%.[1]   In general, Schussel, who has advanced academic degrees in computer science, helped set up events.  He also participated in the events, primarily as a guest speaker.  Gomes ran the day-to-day operations.  In 1985, Schussel hired Diane Reed ("Reed") to handle DCI's accounting.[2]  By 1993, Reed had become controller of DCI and oversaw the accounting for the company.  Schussel still maintained ultimate control over all of DCI's finances, providing, among other things, explicit direction to Reed on how DCI's revenues were to be handled.

DCI's primary source of revenue came from participants paying to attend the particular event and vendors buying booth space to display software and other products.  By the mid to late 1980's DCI was generating millions of dollars in revenue.  While there was a downturn in the business in 1990, the revenues rebounded substantially through the early to mid-1990's, to the point where revenues again reached into the millions of dollars.

---

[1]   Gomes is an unindicted co-conspirator who has pled guilty to tax charges relating to income he received during his employment at DCI that he failed to report to the IRS.

[2] Reed is also an unindicted co-conspirator who has pled guilty to tax charges relating to income she received during her employment at DCI that she failed to report to the IRS.

At first, DCI conducted its business mostly in the United States. Then, in the late 1980's, DCI started to do conferences and trade shows in Europe. In particular, DCI planned and coordinated events in France, the United Kingdom, Italy, Spain and Germany. DCI also conducted trade shows and seminars in Canada and Australia.

### 2.     The Scheme to Divert DCI Income.

In 1988, Schussel created a Bermuda-based entity called Digital Consulting International, Ltd. ("DCIL"). Schussel was both a director and President. Schussel's wife (Sandra) and Gomes were named as Vice Presidents. DCIL was nothing more than a shell. It performed no seminar or trade show services. It did, however, open a bank account at the Bank of Bermuda (the "Bermuda Account"), with Schussel, Schussel's wife, and Schussel's daughter (Stacey) as the authorized signatories. Around that same time, Schussel opened up an account at Fidelity Investments in the name of  "Digital Consulting International" (the "Fidelity Account"). Although opened in the name of "Digital Consulting International," the Fidelity Account was owned and controlled by Schussel.

Beginning in 1988 and continuing through 1995, Schussel directed Reed to deposit into the Bermuda Account monies coming into DCI that were generated from business conducted by DCI in the United States. Thus, a portion of revenues generated from seminars or trade shows run by DCI, where customers paid the fees to DCI, were diverted to the DCIL Bermuda Account. For example, depending upon how much money was in the DCI operating account held at Northmark Bank in Andover, Massachusetts (the "Northmark Account"), Schussel would instruct Reed to deposit $100,000 or $200,000 directly to Bermuda. The deposits to Bermuda would usually be accompanied by a letter of instruction, signed by Reed, directing personnel at

the Bank of Bermuda to deposit the enclosed checks into the Bermuda Account. After the checks cleared, Reed would then instruct the Bank of Bermuda to wire funds from the Bermuda Account to the Fidelity Account (or, in some instances, to other accounts controlled by Schussel or Gomes).

Reed kept track of the monies diverted to Bermuda. She maintained a running spreadsheet noting each time a deposit was made, the amount, and the distribution from that amount made to Schussel and Gomes.[3] Schussel, Reed and Gomes also maintained management spreadsheets, titled "DCI Cash Flow," that contained distributions made to Schussel and Gomes, including the amounts received by them that had been diverted to Bermuda. In total, these spreadsheets show that Schussel received in excess of $10 million of funds that had been diverted to the Bermuda Account from 1988 through 1995.

### 3.    The 1991/92 and 1995 IRS Audits.

In late 1991 and early 1992, the IRS conducted an audit of DCI (the "1991/92 Audit"). The 1991/92 Audit covered the tax years 1986 through 1990. During the audit, the IRS Revenue Agent, Larry Griffin ("Larry Griffin"), discovered and questioned at least two payments that were made in 1988 by DCI to DCIL. Larry Griffin's working papers show that Schussel represented to him, falsely, that the payments represented commission for services performed by DCIL. The working papers also show that Griffin was provided with two documents, signed by Schussel and Gomes, that reference each payment as being made for services DCIL purportedly performed for DCI. In fact, no such services were performed at that time (or at any time) by

---

[3] Schussel had an arrangement with Gomes whereby Gomes received a certain percent of the monies diverted based on Gomes' bonus compensation and 5% ownership in DCI.

DCIL.  Although Larry Griffin eventually made some adjustments, he did not take any further

action on the DCIL payments for which Gomes and Schussel had provided the documents.  At

no time during the 1991/92 Audit did Schussel disclose his ownership or control of DCIL, the

Bermuda Account, or the true basis of the payments about which Larry Griffin had asked.

    In 1995, the IRS again audited DCI for the tax year 1993.  This audit was assigned to IRS

Revenue Agent Deborah Bennett ("Bennett").  Again, Schussel did not disclose to Bennett the

existence of the Bermuda Account or his position as officer and director of DCIL.

### 4.    Continuation of The Conspiracy: the "User Groups."

    Shortly after the 1991/92 Audit, Schussel directed Reed to stop depositing all the

customer receipt checks that were paid to DCI into the Northmark Account.  At Schussel's

instruction, instead of depositing all the customer checks into the Northmark Account, Reed took

numerous customer receipt checks and mailed them directly to the Bermuda Account.

    Later, Reed used a different method of sending the monies to the Bermuda Account.

Specifically, she sent the funds from "user group" accounts controlled by DCI.  The "user group"

accounts related to a particular process DCI employed to organize the finances for a particular

event.  In addition to having customers pay DCI directly for services provided, DCI would also

set up individual bank accounts tied to particular events DCI was hosting with another company.

These accounts were referred to as "user group" accounts.  The "user group" accounts were set

up for events that a company wanted DCI to run on behalf of that company.  For example, if

Microsoft hired DCI to plan and coordinate a trade show that would host 10,000 attendees, DCI

would set up a separate account at Northmark Bank in the name of the show (e.g., "DCI d/b/a

Microsoft '95 Expo").  The account would be entirely under the control of Schussel, with Reed

handling the account.  The "user group" account was then used to deposit receipts from the specific event and to pay expenses incurred with that event.  Checks that were written out by companies attending the event (such as "Microsoft '95 Expo") would be deposited in that "user group" account.  Whatever balance remained in the account after expenses were paid and the profit split with the company was a profit to DCI.

At various times, Schussel directed Reed to send these profits to the Bermuda Account. This would typically be done in one of two ways.  Sometimes, checks were written directly out of the "user group" accounts and deposited in the Bermuda Account.  Other times, original attendee checks that were made out in the name of the "user group" account were deposited directly in the Bermuda Account.

The Bermuda Account records show that from 1993 to 1995, Schussel diverted approximately $8 million of DCI's income to the Bermuda Account.  This was taxable income that he failed to report to the IRS.  Moreover, shortly after funds were deposited in the Bermuda Account, Schussel directed that the Bank of Bermuda send the funds to the Fidelity Account.  By diverting income of DCI to the Bermuda Account, then transferring the funds back to the United States, Schussel evaded taxation of those funds, both corporate and personal.

### 5.    Plot to Destroy Records.

The diversion of DCI profits to Bermuda continued through 1995.  Sometime in 1994 or 1995, Schussel began to explore selling DCI.  His diversion of funds to the Bermuda Account and the Fidelity Account, however, created a problem for Schussel in persuading buyers about the true value of the business.  Since the monies he had diverted to Bermuda had not been incorporated into the DCI revenues, DCI appeared to be less valuable to potential buyers than if

those funds had been included. To deal with this problem, Reed advised Schussel to disclose the deposits that were made to the Bermuda Account and make available his personal income tax returns. Schussel responded, in words or substance: "do you really believe I'm reporting the money going to Bermuda?" Reed said she told Schussel that he should be, and he responded by laughing at her and telling her that she best keep his secret because her name was on everything and she would be in as much trouble as he would be. Reed continued with the evasion scheme through 1995, during which time Schussel diverted over $4 million of DCI's income to Bermuda.

Early in 1996, in discussions with Gomes and Reed, Schussel decided to stop diverting DCI's profits to the Bermuda Account in order to prepare the company for sale. Schussel closed the Bermuda Account in early 1997. Gomes, Reed and Schussel remained concerned, however, that the prior diversion would be discovered, either by the buyer (who might contact the IRS) or by the IRS itself. Gomes, Reed and Schussel discussed a variety of steps they could take to frustrate efforts of buyers or others from identifying the prior diversion. They discussed how to tamper with DCI documents by recreating certain records or deleting certain records in DCI's computer database. They also discussed how the diversion of profits to Bermuda could be done legally. In addition, steps were taken in the summer of 1997 to destroy certain DCI records related to the company's finances.

Among such steps was "Project Phoenix." During 1997, Schussel's daughter, Stacey, and her husband, Michael Griffin ("Michael Griffin"), both also unindicted co-conspirators, participated in some of the discussions about destroying records. In the summer of 1997, Michael Griffin was tasked with developing a strategy, formally called "Project Phoenix," that

would entail the deletion of, and tampering with, revenue information, so that if any audit (motivated by a buyer or by the IRS) were to occur, the revenue information in the computer database, would match the revenue information in the 1995 DCI corporate tax return. In connection with this, Schussel, Reed, Gomes, and Michael Griffin discussed the fact that they needed to locate certain DCI checks that had been negotiated through the Bank of Bermuda. In particular, there had been a series of DCI checks that were tainted because they showed a connection between DCI, DCIL and the Bermuda Account. Michael Griffin laid out a plan whereby the checks could be altered, along with the corresponding computer data so that the scheme to divert funds to Bermuda would not be discovered by anyone. In the summer of 1997, this plan was set in place, just in case DCI received notice from the IRS that an audit of its 1995 corporate return would occur.

### 6.     The 1997/98 IRS Audit.

In September 1997, when discussions were still taking place between Schussel, Gomes, Reed, Michael Griffin, and others regarding the actions that needed to take place in order to sell the company and to keep the trail to Bermuda hidden, the IRS notified DCI that it would conduct an audit of DCI's 1995 corporate income tax return. This audit (the "1997/98 Audit") was assigned to IRS Revenue Agent Kelly Jordan ("Jordan").[4] Jordan conducted an initial interview of Reed and Schussel in October 1997.[5] During that interview, neither Reed nor Schussel disclosed the existence of DCIL or the Bermuda Account. Nevertheless, as Jordan conducted the audit, she came across a "user group" check that had been improperly entered on the general

---

[4] At the time of the audit, Jordan, who is married, went under her maiden name, McGovern.

[5] Paul Law, the tax preparer for DCI and Schussel, was also present.

ledger as a refund.  This prompted Jordan to ask for cancelled checks relating to accounts

controlled by DCI, including the "user group" accounts.  Gomes and Reed discussed the problem

with Schussel and informed him that Jordan was on the verge of discovering the diversion of

DCI income to the Bermuda Account.

     At some point, shortly after Jordan had discovered the "user group" checks, Schussel,

Gomes, Reed and Michael Griffin discussed what could be done to conceal the "user group"

checks that had cleared through Bermuda.  At the end of the meeting, Schussel thanked everyone

for being in the "foxhole" with him.

     When Jordan had discovered the "user group" accounts, Schussel went to Kenneth

Glusman ("Glusman"), an attorney who had been assisting Schussel in the possible sale of the

business.  Glusman referred Schussel to Edward DeFranceschi ("DeFranceschi"), a tax attorney.

At that point, DeFranceschi took over the representation of Schussel and DCI in connection with

the 1997/98 Audit.

     Jordan eventually discovered "user group" checks that were being paid to DCIL and

negotiated through the Bermuda Account.  In February 1998, Jordan continued to inquire about

the relationship between Schussel, DCI, and DCIL.  Schussel then provided DeFranceschi with a

document titled "Contract of Agreement," that purportedly set forth the contractual relationship

between DCI and DCIL.  It was purportedly signed on September 9, 1993 by a "J. Cardullo" on

behalf of DCIL.  On February 13, 1998, DeFranceschi forwarded the "Contract of Agreement" to

Jordan.  In the cover letter DeFranceschi further stated that "the arrangement between the

companies has been in effect in various forms since 1988."  By fax dated February 16, 1998,

Schussel confirmed that he was aware that DeFranceschi had forwarded that contract to Jordan.

The United States expects to prove that the "Contract of Agreement" was not a genuine contract and was materially false and misleading. To begin with, the United States expects to show that sometime in 1988 or 1989, John Cardullo ("Cardullo") was hired to be director of international operations for DCI. In that capacity, Cardullo was responsible for managing DCI's international events. The United States expects Cardullo to testify, among other things, (1) that he never conducted any business with DCIL while he was at DCI, (2) that he never associated with an entity called DCIL, (3) that he was never aware of any arrangement between DCIL and DCI whereby DCIL would provide international event services to DCI, (4) that the signature on the Contract of Agreement is not his, and (5) that he had left DCI before September 9, 1993, the date the Contract of Agreement was purportedly signed.

Moreover, the Contract of Agreement sets forth a host of services and undertakings supposedly provided by DCIL to DCI pursuant to the agreement. The United States expects to show that DCIL never preformed the services set forth in that "Contract of Agreement." The United States also expects to show that employees, such as Reed, who were in a position to know about DCI's contracts (particularly contracts of the magnitude set forth in the "Contract of Agreement"), never heard of such a contract or any services being performed and paid to DCIL pursuant to such a contract.

Following her receipt of the letter and Contract of Agreement from DeFranceschi, Jordan directed an "Information Document Request" to DeFranceschi on February 24, 1998. In that request, Jordan requested additional information about Schussel and his relationship to DCIL. DeFranceschi sent the request to Schussel, who then drafted responses to the request. Schussel sent his responses to certain of the questions on March 4, 1998. In that response, he described

how the DCIL services were employed.  He also discussed the 1991/92 Audit.  Schussel's statements in the letter as to his role in DCIL, the circumstances of its founding, the services DCIL supposedly provided, and the circumstances of the 1991/92 Audit were intentionally, and materially, false and misleading.

DeFranceschi incorporated Schussel's draft responses in a letter, dated March 11, 1998, and sent that letter to Jordan.  That letter stated, among other things, that Schussel was not an officer of DCIL; that the DCI payments were made pursuant to the Contract of Agreement; and that in the 1991/92 Audit, Larry Griffin "questioned transactions much like the situation that existed in 1995."

These statements, among others, were false and materially misleading.   It was not true to say that Schussel was not an officer.  He was, in fact, the President of DCIL.  As discussed above, the "Contract of Agreement" was a fabricated document.  And, even if that were not so, it was false to say that any payments were being made pursuant to that contract.  Indeed, the financial records show that nearly all of the funds sent to the Bermuda Account were soon thereafter returned to the Fidelity Account or used to make payments to Gomes.  Furthermore, by referring to the earlier audits, particularly the 1991/92 Audit by Larry Griffin, Schussel relied upon his misrepresentations in that audit to persuade Jordan that the relationship between DCI and DCIL and the payments from DCI to DCIL had legitimate economic substance.  In short, the United States expects to prove that the March 11, 1998 letter, sent with the knowledge of and at the direction of Schussel, was sent with the specific intent to mislead or conceal from Jordan the true circumstances of the DCI payments and the diversion of millions of dollars in unreported income to the Bermuda Account and, in turn, the Fidelity Account.

The representations in the March 11, 1998 letter were material.  As a result of the letter provided by DeFranceschi (a copy of which he provided to Schussel), the fraudulent contract that DeFranceschi provided to the IRS, and other statements that were made to her, Jordan concluded that DCI and DCIL had been involved in an "arms length" transaction and made no specific adjustment involving DCIL to DCI's 1995 corporate tax return.[6]  After these adjustments were made, Jordan then determined that there was nothing else to look at and concluded the audit in May 1998, believing that the relationship between DCI and DCIL was "arms length," that the relationship had terminated prior to 1996, and that Schussel had not been an employee or officer of DCIL.

The United States expects this evidence to establish each of the essential elements of a Klein conspiracy, in violation of 18 U.S.C. § 371 and of tax evasion, in violation of 26 U.S.C. § 7201.

### C.    Legal and Evidentiary Issues Related To Claims of Privilege

The Court has previously ruled that the United States is entitled to introduce into evidence certain documents DeFranceschi provided to the United States that DeFranceschi either received from or transmitted to Schussel.  The Court ruled that these documents either were not privileged, fell within the third-party disclosure exception, or fell within the crime-fraud exception.  Schussel continues to press the objection, but has requested that he be entitled to introduce in evidence or refer to in cross-examination additional documents that he maintains are privileged, but which were either not disclosed to the United States or remain subject to

---

[6]  Jordan made other adjustments to DCI's corporate and Schussel's person returns not directly relevant here.

privilege.  Schussel has asked to use such documents under a theory of "completeness" (i.e., to

complete the picture of what happened between DeFranceschi and Schussel where the

documents the United States will be permitted to introduce may, in his view, present an

incomplete or misleading impression).  Schussel has also suggested that the relevance of such

documents is for purposes of establishing a "reliance on counsel" defense.  Schussel seems to

also ask that use of such documents (1) not permit the United States to use those (or related)

documents and (2) not be deemed a waiver of whatever privilege may attach to those documents

and their subject matter.

### 1.    The Effect of Fed. R. Evid. 106 On Documents Claimed To Be Privileged.

Fed. R. Evid. 106 ("Rule 106") provides that when "a writing or recorded statement or

part thereof is introduced by a party, an adverse party may require the introduction at that time of

any other part or any other writing or recorded statement which ought in fairness to be

considered contemporaneously with it."  Fed. R. Evid. 106.  Rule 106, and the corresponding

doctrine of completeness, "operates to ensure fairness where a misunderstanding or distortion

created by the other party can only be averted by the introduction of the full text of the out-of-

court statement."  United States v. Awon, 135 F.3d 96, 101 (1st Cir. 1998), abrogated on other

grounds, United States v. Piper, 298 F.3d 47 (1st Cir. 2002).  Rule 106 permits "'a party against

whom a fragmentary statement is introduced [to] demand that the rest of the statement (or so

much thereof as is appropriate) be admitted into evidence in order to place the excerpt in

context.'"  United States v. Millan, 230 F.3d 431, 434 (1st Cir. 2000) (quoting United States v.

Houlihan, 92 F.3d 1271, 1283 (1st Cir. 1996)).  The First Circuit has cautioned that Rule 106

does not create a broad exception allowing for the wholesale introduction of otherwise

14

inadmissible evidence simply because one party has referred to a portion of such evidence.  See Awon, 135 F.3d at 101.  "[T]he rule of completeness applied only where the introduction of limited pieces of information created unfairness or potential for misimpression."  United States . v. Simonelli, 237 F.3d 19, 28 (1st Cir. 2001).

Under these principles, Rule 106 is not implicated at all unless there is something unfair or misleading about the documents the United States proposes to introduce.  In this case, the Court has held that certain documents Schussel sent to DeFranceschi are not subject to the protections of the attorney client privilege because they are either not privileged or fall within the crime-fraud and third party disclosure exceptions to the privilege.  In this case, the documents show Schussel's role in communicating false and misleading information to the IRS during the 1997/98 Audit.

The United States does not believe that these documents create either "unfairness" or a "misimpression" in a way that would trigger Rule 106 and allow Schussel to introduce additional documents under a theory of "completeness."  Thus far, Schussel has not claimed that the United States intends to introduce snippets of the documents taken out of context.  He has not argued that the United States is omitting companion letters, or responsive faxes, or closely related attachments that, if included, would correct an unfair misimpression as to Schussel's role in providing false information to Jordan during the audit.

At the status conference on December 20, 2006, Schussel said that the additional documents he intends to introduce will tend to show his "reliance" on counsel.  If this is, in fact, the purpose for which Schussel wants to use the documents, Schussel is seeking to apply the concept of "completeness" at a level of generality that is much wider than what is supported by

the case law.  The First Circuit has recognized that the notion of "completeness" lacks clear boundaries.  See Houlihan, 92 F.3d at 1283 ("completeness, like beauty, is frequently in the eye of the beholder.").  Nevertheless, the mine run of cases in the First Circuit applying Rule 106 assess "completeness" through a much narrower lens.  Those cases address such circumstances as (1) whether portions of a transcript or statement were misleading requiring other portions, or the entirety, of the transcript or statement to be included, see Simonelli and Houlihan, (2) whether prior statements to police should be admitted in their entirety to rehabilitate a witness, see Arwon,  or (3) whether a statement of facts appended to a plea agreement should be admitted in its entirety, see Millan.  They do not support the conclusion that "completeness" provides a basis for wholesale introduction of evidence to develop an affirmative defense, such as "reliance on counsel."  To be sure, Schussel may be entitled (consistent with other rules) to present documents that support his  "reliance" on counsel defense, but their admission should not be predicated on Rule 106.

Should the Court disagree with the United States and determine that Schussel is entitled to introduce additional documents under a Rule 106 "completeness" theory, then the Court should, as a matter of fairness, apply that notion of "completeness" consistently for both parties. So, for instance, if Schussel, as he did at the motion to suppress, uses or introduces documents bearing on discussions between DeFranceschi and Schussel regarding the filing of an amended personal return, then the United States should be allowed (1) to use those documents in any redirect examination, cross-examination, or examinations of other witnesses, and (2) use and introduce other documents bearing on that subject.

It should not affect this analysis that the documents Schussel wants to use are documents he claims are still subject to an attorney-client privilege. The First Circuit has made clear that "the attorney-client privilege is not absolute." <u>Federal Deposit Ins. Corp. v. Ogden Corp</u>, 202 F.3d 454, 461 (1st Cir. 2000). It is subject to a number of exceptions and limitations, such as the crime fraud or third party disclosure exceptions. It may also be waived by the holder of the privilege. While the United States has not found any cases discussing this issue in the context of attorney-client privilege, it has found one case discussing this in the context of a claim of work product. <u>See</u> <u>United States v. Salsedo</u>, 607 F.2d 318 (9th Cir. 1979). In that case, the defense counsel referred in cross-examination to a transcript of a recorded conversation that he, the defense counsel, had prepared as work product. <u>Id.</u> at 320. Relying on Rule 106, the district court ordered the defense counsel to disclose the transcript to the government. <u>Id.</u> at 320-21. The Ninth Circuit upheld the ruling stating that the work product rule was a qualified, not absolute, privilege because it is "subject to waiver by its holder." <u>Id.</u> at 320. According to the Ninth Circuit, disclosure of the transcript was the correct ruling under Rule 106 because "defendant's counsel waived any work product privilege in relation to the transcript through the use of the transcript in his cross-examination." <u>Id.</u> at 321.[7]

---

[7] One commentator has discussed the issue of privilege in the context of Rule 106. <u>See</u> Wright & Graham, <u>Federal Practice and Procedure, Federal Rules of Evidence</u>, § 5078.2 p.537 (2005). That commentator distinguishes between instances where the holder of the privilege is a third party and where the holder is the proponent of a truncated statement. In the latter instance, which is applicable here since Schussel would be the proponent of partial, but not complete information he claims to be privileged, the commentator says that "the introduction of a part of a privileged communication would normally be a waiver as to the part needed for completeness." <u>Id.</u> That same commentator has noted that in the context of an absolute privilege not subject to an exception the court might consider excluding the truncated evidence. As an example, the commentator refers to a situation he describes as a "ploy": where one spouse may claim a spousal communication privilege for a matter needed to complete a truncated statement

17

The United States expects Schussel to distinguish this case on the ground that any disclosure of otherwise privileged information is not a "waiver" because, in this case, he has been forced, involuntarily, to introduce the otherwise privileged information as a result of this Court's ruling that certain of the DeFranceschi documents are admissible. He has objected to the ruling, and seeks to preserve that objection and to introduce the additional information subject to the objection.

Again, the United States has been unable to find any cases discussing this precise issue in the context of the attorney-client privilege. It has, however, found a case raising this precise situation (as posited by Schussel) in the context of the Fifth Amendment privilege. See United States v. Palladino, 401 F.3d 471 (7th Cir. 2005) cert. denied, 126 S.Ct. 1743 (2006). In that case, the trial court violated Rule 106 by allowing a misleading, truncated version of the defendant's prior deposition to be entered into evidence. The defendant then took the stand and testified. The defendant argued "that he would not have taken the stand had he not been compelled by the trial judge's erroneous ruling (and erroneous it was) to rectify the government's misleading editing . . . [and] that the ruling infringed his Fifth Amendment right not to be compelled to testify." Id. at 477. To this the Seventh Circuit said that "the Supreme Court has held that there is no compulsion in such a case." Id. That is because "the defendant has the option of refusing to testify and, instead, if he is convicted, of obtaining appellate correction of the erroneous evidentiary ruling and with it a new trial." Id. (citing several cases).

---

introduced by the other spouse. Id. (citing United States v. LeFevour, 798 F.2d 977 (7th Cir. 1986)). This is not relevant here since Schussel has within his control the ability to cure any purported "misleading" or "truncated" evidence regarding DeFranceschi by disclosing all the information he does have.

18

The Seventh Circuit recognized that "[t]his rule puts the defendant to a hard tactical choice." Id. It explained, however, that "the alternative would be to give him two bites at the apple: testify and try to win an acquittal; if that fails, appeal and get a new trial on the basis of the judge's ruling." Id.

The principles discussed in Palladino are applicable here.  It is not a fair characterization of the situation here to claim that Schussel is being "compelled" to put on additional privileged information, or that he is "involuntarily" waiving his privilege  – at least not in a sense that is legally relevant to the question of the operation of Rule 106 and the waiver of the attorney-client privilege.  His choice here may be a difficult one, but it is, at base, a tactical one.  Once Schussel decides to put in additional evidence he currently is asserting is privileged, he has made the tactical choice to open up those communications to scrutiny.  Both as a matter of fairness and as a matter of settled principles of privilege waiver, the United States should be entitled to have access to the communications and to be able to introduce them (if otherwise admissible).

### 2.      Reliance on Counsel.

The above-discussion touches on a related issue the United States expects to arise during the trial of this case.  As discussed above, Schussel has suggested that he will be raising a "reliance" on counsel defense.  Such a defense, which is otherwise referred to as an advice of counsel defense, requires the following elements:  "a defendant must establish that: (1) before taking action, (2) he in good faith sought the advice of an attorney whom he considered competent, (3) for the purpose of securing advice on the lawfulness of his possible future conduct, (4) and made a full and accurate report to his attorney of all material facts which the defendant knew, (5) and acted strictly in accordance with the advice of his attorney who had

been given a full report." <u>See</u> <u>Liss v. United States</u>, 915 F.2d 287, 291 (7th Cir. 1990) (<u>citing</u>

Devitt and Blackmar, <u>Federal Jury Practice and Instruction</u>, 14.12 (3d Ed.1977)).[8]  Schussel's

foreshadowing of this defense raises at least two issues that the court may need to address.  First,

in the United States' view, if Schussel presents a reliance on counsel defense, he will waive the

privilege.  Second, depending upon how the evidence develops at trial, Schussel may not be

entitled to an instruction on such a defense.

a.     Waiver.

It is well settled that an advice of counsel defense waives the privilege as to the subject

matter of the advice.  The First Circuit has said:

> [w]hen such a defense is raised, the pleader puts the nature of its lawyer's advice
> squarely in issue, and, thus, communications embodying the subject matter of the
> advice typically lose protection. . . . Implying a subject matter waiver in such a
> case ensures fairness because it disables litigants from using the attorney-client
> privilege as both a sword and a shield. Were the law otherwise, the client could
> selectively disclose fragments helpful to its cause, entomb other (unhelpful)
> fragments, and in that way kidnap the truth-seeking process.

<u>In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)</u>, 348 F.3d 16, 24 (1st

Cir. 2004) (citing  <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1292 (2d Cir.1991)).  If Schussel

pursues a "reliance" or advice of counsel defense, the privilege is waived as to all

communications on the subject matter of that "reliance" or advice.

---

[8]  Although Schussel has in the past claimed that there is some difference between his defense
of "reliance" on counsel and the "advice" of counsel defense, the case law using the term
"reliance" requires the same elements be met.  <u>See</u>, <u>for example</u>, <u>United States v. Reesor</u>, 10
Fed.Appx. 297, 308 (6th Cir. 2001) (unpublished) ("The elements of a reliance on counsel
defense are (1) full disclosure of all pertinent facts to counsel, and (2) good faith reliance on
counsel's advice."); <u>see</u> <u>also</u> <u>United States v. Evangelista</u>, 122 F.3d 112, 117 (2d Cir. 1997)
(describing "reliance" on advice elements); <u>United States v. Mathes</u>, 151 F.3d 251, 255 (5th Cir.
1998) (describing requirements to establish reliance on counsel's advice).

20

This is so even if Schussel claims that he is being forced to pursue the defense.  See

United States v. Edgar, 82 F.3d 499 (1ˢᵗ Cir. 1996).  In Edgar, the defendant argued that, as a

consequence of a claimed wrongful disclosure of privileged information during grand jury

proceedings, he was prejudiced because "he was deprived of the choice as to whether to assert an

advice of counsel defense."  Id. at 509.  The First Circuit rejected that argument, saying:

> Edgar chose not to assert that the false tax returns were prepared and submitted on
> advice of counsel.  He was free to have made such an argument, if supported, at
> trial [regardless of certain grand jury testimony].  Had he made such an argument,
> of course, he would have waived any claim that the attorney-client privilege
> protected those discussions. . . The choice as to whether to make such arguments
> was not foreclosed to him and was a strategy choice by trial counsel.

Id.  As Edgar suggests, if Schussel chooses to advance a "reliance on counsel" or advice of

counsel defense, even under circumstances where he claims his right to choose whether to assert

that defense has been affected by a disclosure outside of his control, he will waive his claim of

privilege.

### b.    Jury Instruction on "Reliance" or Advice of Counsel.

Whether Schussel will be entitled to an instruction on his "reliance" of counsel defense

will depend in large part on the evidence at trial.  There are, however, a couple of principles that

will be relevant to whether Schussel will be entitled to such an instruction.

First, reliance on counsel or advice of counsel is a specialized form of good faith

instruction.  The First Circuit has recently reaffirmed its principle that separate good faith

instructions are not required.  See United States v. Mueffelman, 2006 WL 3410899  (1ˢᵗ Cir.

Nov. 28, 2006) ("If references to good faith are made in fraud instructions, this must be done

with great care"; trial court's separate good faith instruction "overly favorable" to the

defendant); see also United States v. Dockray, 943 F.2d 152 (1st Cir. 1991) (where proper

instruction on intent to defraud, a separate instruction on good faith is not required).  This

principle applies even when there is a request for a "reliance" on counsel instruction.  See

United States v. Christopher, 142 F.3d 46, 55 (1st Cir. 1998) (where court adequately instructed

on the intent to defraud "the refusal to give a reliance-of-counsel instruction was not error").

     Second, the evidence may well not support providing such an instruction to the jury.

Where the evidence does not support such a theory, such an instruction may be declined.  See,

for example, Evangelista, 122 F.3d at 117-118 (defendants not entitled to reliance on advice of

counsel instruction where there was no basis on the evidence that they acted in good faith in

honestly following the advice).  Depending upon what evidence is admitted, the United States

may take the position that no advice or "reliance" on counsel instruction is appropriate.

     **D.**    **Other Issues**

     **1.**    **Statute of Limitations.**

     Schussel has previously argued that Counts Two and Three are barred by the applicable

statute of limitations.  Schussel was indicted on February 26, 2004.  The statute of limitations for

an offense charged under 26 U.S.C. §7201 is six years.  See 26 U.S.C.§ 6531.  Schussel has

previously argued that (1) his crime of tax evasion was complete as of the filing of the corporate

and income tax returns on or about March 15, 1996; (2) that the statute of limitations began to

run as of then; and (3) that the statute of limitations had run on or about March 15, 2002.

Schussel's positon is contrary to First Circuit law.

     The First Circuit Court held in United States v. Ferris that "it is the date of the latest act

of evasion, not the due date of the taxes, that triggers the statute of limitations." 807 F.2d 269,

271 (1st Cir. 1986); accord United States v. Anderson, 319 F.3d 1218 (10th Cir. 2003), United States v. Dandy, 998 F.2d 1344 (6th Cir. 1993); United States v. Wilson, 118 F.3d 228 (4th Cir. 1997); United States v. Winfield, 960 F.2d 970 (11th Cir. 1992); United States v. DeTar, 832 F.2d 1110 (9th Cir. 1987). As Ferris noted, "[t]he language of § 145(b) [the predecessor to 26 U.S.C. § 7201] which outlaws willful attempts to evade taxes 'in any manner' is clearly broad enough to include false statements made to Treasury representatives for the purpose of concealing unreported income." Ferris, 807 F.2d at 270. Here, as alleged in the indictment, and as the United States expects to prove at trial, Schussel committed affirmative acts of evasion after February 26, 1998.

Schussel has said that he will address this issue more specifically in his trial brief. At that time, the United States will respond if there are any new issues raised that were not addressed in the United States' previous opposition to Schussel's motion to dismiss Counts Two and Three on statute of limitations grounds.

## 2.    Jellicle Investments.

In an effort to narrow the area of disagreement over whether the United States should be permitted, under Rule 404(b), to introduce evidence regarding Schussel's use of one of his companies, Jellicle Investments ("Jellicle"), improperly to deduct personal expenses as business expenses of Jellicle, the United States has discussed this issue further with Schussel. Based on these discussions, the United States does not intend to introduce as separate 404(b) evidence Schussel's improper use of Jellicle. There are, however, certain documents that the United States may introduce as evidence on the substantive conspiracy and tax charges that contain references to Jellicle. Based on discussions with Schussel, it is the United States' understanding

that he does not intend to object to the introduction of documents relevant to the substantive

counts on the basis that they contain references to Jellicle.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By:

**/s/ Jack W. Pirozzolo**
Carmen M. Ortiz
Jack W. Pirozzolo
Assistant U.S. Attorneys

Date:   December 29, 2006

**CERTIFICATE OF SERVICE**

I, Jack W. Pirozzolo, hereby certify that on December 29, 2006 I served a copy of the foregoing by electronic filing on counsel for the defendant.

**/s/ Jack W. Pirozzolo**
Jack W. Pirozzolo
