UNITED STATES DISTRICT COURT
DISTRICT COURT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>      v. )<br>)<br>GEORGE SCHUSSEL, )<br>          Defendant )<br>) | CRIMINAL NO. 04-10060-RCL |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION FOR ACQUITTAL OR NEW TRIAL**

The United States opposes defendant George Schussel's ("Schussel") motion for acquittal or in the alternative, a new trial. Viewing the evidence in the light most favorable to the government, sufficient evidence existed for the jury to find Schussel guilty of both the conspiracy count and the two tax evasion counts. Schussel's statute of limitations arguments and challenges to the evidence of the charged conspiracy are without merit. Similarly, no new trial is warranted. The jury instructions correctly and sufficiently conveyed the legal principles applicable to the charges, and there was overwhelming evidence of Schussel's guilt to support the jury's verdict.

**I.    There is No Basis To Set Aside The Jury Verdict Under Rule 29**

    **A.    The Statute of Limitations Does Not Bar Schussel's Prosecution for Tax Evasion Under 26 U.S.C. §7201**

Relying primarily on United States v. Uscinski, 369 F.3d 1243 (11th Cir. 2004) and Sansone v. United States, 380 U.S. 343 (1965), Schussel claims that the two counts charging him with tax evasion (26 U.S.C. § 7201), are barred by the statute of limitations because the crimes were complete when the tax returns were filed on March 15, 1996.[1] In making this argument, Schussel

---

[1] See, Defendant George Schussel's Motion for Judgment of Acquittal or, in the Alternative, a New Trial at 3 (hereinafter referred to as "Def. Mot.").

1

misconstrues the holdings in those cases to mean that the use of the term "complete" implies that in a case relating to a violation of § 7201 the statute of limitations begins to run when a tax return is filed and cannot, therefore, be extended by a subsequent affirmative act of evasion.

While it is true that the crime of tax evasion is "completed" when a false and fraudulent tax return is filed -- meaning that all of the elements have been committed and the offense can be prosecuted -- it is also true that subsequent evasive acts after the filing of a return may be considered part of the offense and extend the statute of limitations. See United States v. Ferris, 807 F.2d 269, 271 (1st Cir. 1986) ("it is the date of the latest act of evasion . . . that triggers the statute of limitations."); accord United States v. Anderson, 319 F.3d 1218 (10th Cir. 2003); United States v. Dandy, 998 F.2d 1344 (6th Cir. 1993); United States v. Wilson, 118 F.3d 228 (4th Cir. 1997); United States v. Winfield, 960 F.2d 970 (11th Cir. 1992); United States v. DeTar, 832 F.2d 1110 (9th Cir. 1987).

In Ferris, the defendant evaded taxes in 1977, and later when questioned in 1979 by IRS agents and in 1983 at the United States Attorney's Office, defendant made false statements denying that he had received income from a business deal (the Moxie Cove deal) in 1977. Id. at 270. The court found that an indictment filed in 1985 charging the defendant with tax evasion, was not barred by the statute of limitations. Id. at 272. The court stated that the false statements that the defendant made in 1979 and 1983 were continuing attempts to evade payment of the 1977 income tax. Id. at 271. Where the tax-evasion motive plays any part in such conduct [concealment of assets or covering up sources of income] the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime. Id. at 271. The court made clear that an

act constituting evasion which occurs during the limitation period brings the prosecution within the statute of limitations even if the taxes being evaded were due and payable prior thereto. Id. at 271.

Schussel attempts to distinguish Ferris and argues that it does not apply to the case at hand, because no tax return was filed in that case. Def. Mot. at 3.[2] Yet the Court in Ferris specifically stated that

> The acts upon which the crime was based here are the false statements made in 1979 and 1983, continuing attempts to evade payment of the 1977 income tax. If all that defendant had done was fail to file his 1977 income tax return, then the last act of evasion would have been April 15, 1978, the date the return and tax were due. The defendant, however, by deceitful statements continued his tax evasion through January of 1983.

807 F.2d at 271.[3]

Provided the offense is complete, the First Circuit does not distinguish between those defendants who file false income tax returns and those defendants who do not for the purpose of the holding in Ferris. The statute of limitations begins to run from the date of the last affirmative act of income tax evasion. In the instant case, the evidence was sufficient for the jury to find that after Schussel filed false and fraudulent 1995 tax returns for DCI and himself in 1996, that he thereafter committed affirmative acts of evasion, including and leading up to, the making of false statements to the IRS in the March 11, 1998 letter, well within the applicable six-year statute of limitations.

---

[2] Incorporating Defendant George Schussel's Motion for Judgment of Acquittal and Incorporated Memorandum of Law (Doc. 99)("Rule 29 Motion") at 7-9 (hereinafter referred to as "Rule 29 Mot."); Rule 29 Mot. at 8.

[3] Schussel's interpretation of Ferris also ignores the fact that in reaching its holding, the First Circuit cited a case in which the defendant did in fact file an income tax return as part of the tax evasion in violation of 26 U.S.C. §7201. See id. at 271 (citing United States v. Mousley, 194 F. Supp. 119 (E.D.Pa. 1961)).

Schussel also contends that even if the statute of limitations does not bar prosecution as to Count Two, the false statements found in the March 11, 1998 letter that was given to the IRS by Schussel's attorney, does not extend the statute as to Count Three, which relates to his personal return. See Rule 29 Mot. at 9. He bases this argument on the premise that the audit that was misled and obstructed was an audit of DCI's corporate return. What Schussel fails to accept is that DCI's income tax return is so intertwined with his personal return, that evasion with respect to the corporate tax return implies evasion with respect to his personal return. See Mousley, 194 F. Supp. at 119 (when a taxpayer files an individual tax return in close proximity to the filing of a corporate tax return, "both acts [are] part of the same attempt to evade"). The evidence was sufficient to show that income not reported on DCI's 1995 corporate tax return and ultimately diverted to Schussel's investment account at Fidelity Investments, should have been reported on his personal income tax return for 1995. When Schussel, acting through his tax attorney on or about March 11, 1998, made false statements to the IRS relating to DCI's false corporate tax return, he also concealed the income he had personally received. Thus, the last affirmative act of evasion with respect to the tax deficiency of Schussel himself was within the statute of limitations (after February 26, 1998).

  **B.** **The Indictment Correctly Charged a Single Conspiracy And There Was No Withdrawal From That Conspiracy By the Original Co-conspirators**

    **1.** **A Single Conspiracy Existed From 1988 through 1998.**

The Indictment charged Schussel from in or about January 1988 through in or about May 8, 1998 with knowingly and willfully conspiring to defraud the United States by impeding, impairing, obstructing and defeating the lawful government function of the Treasury Department and the Internal Revenue Service, in the ascertainment, computation, assessment and collection of revenue: to wit, federal income taxes. See Indictment at ¶12. Incorporated in the section of the Indictment

entitled "Manner and Means," are specific acts relating to Schussel's diversion of funds to Bermuda, the obstructed audit in 1991, the filing of false tax returns for several years including 1995, meetings that were held to discuss different ways in which to conceal the diversion of funds from the IRS, and efforts to obstruct the 1997/1998 audit and the use of an attorney to achieve that goal. As noted below, at the trial of this case, there was sufficient evidence for a rational jury to find that, from the outset, an agreement to conceal was part of the conspiracy and that affirmative acts of concealment began even while the initial diversion of revenue and misreporting of income was still ongoing.

Schussel argues that there were "multiple conspiracies" because efforts to conceal the 1995 tax evasion by obstructing the 1997/1998 audit, were not part of the original conspiratorial agreement to evade taxes. See Def. Mot. at 3 (incorporating Rule 29 Mot. at 2-6). In support of this argument, Schussel relies on the Supreme Court's decision in Grunewald v. United States, 353 U.S. 391, 402-405 (1957), which is commonly cited for the proposition that a cover-up is not automatically deemed part of a conspiracy to commit a substantive offense.

What Schussel fails to note, however, is that Grunewald emphatically does *not* stand for the converse proposition, i.e., that a cover-up is automatically deemed to be separate from the underlying crime. In making his argument, Schussel downplays a crucial passage in the Grunewald case, in which the Supreme Court recognized that acts of concealment can at times be significant to the conspiracy itself. The Court commented that "a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." 305 U.S. at 405. Thus, in considering whether a particular effort at concealment

5

is part of a conspiracy for statute of limitations purposes, "the crucial question . . . is the scope of the conspiratorial agreement." Grunewald, 353 U.S. at 397.

The Supreme Court's subsequent decision in Forman v. United States, 361 U.S. 416, 423-24 (1960), clarified and amplified the ruling in Grunewald. Forman held that concealment objectives can indeed be intertwined with an underlying money diversion/tax evasion scheme. Indeed, the facts of the Forman case are closely analogous to the matter at bar. In Forman the off-the-books diversion of cash (which the Court referred to as "holdout income") involved an arrangement to surreptitiously remove money from pinball machines, concealing it from business associates and from the IRS. The defendant in Forman evaded taxes by misreporting income on his tax returns for 1942-1945. The indictment charged, however, that the tax conspiracy encompassed Forman's subsequent efforts, *up to eight years later*, to consummate his tax evasion by concealing the "holdout" income. Id. at 423-424.[4] The gap of eight years in Forman is much larger than existed in this case.

Much like Forman, the Indictment in this case charged -- and the evidence at trial established -- that Schussel participated in a conspiracy from 1988 to 1998 that had, as its objectives, an evasion of taxes, together with the concealment of records (such as the cash flow spreadsheet, Tr. Ex. 17) that would expose the off-the-books diversion of funds. At trial, the evidence established that the concealment objective of Schussel, Reed and Gomes was part and parcel of the original

---

[4]Accord, United States v. Elwell, 984 F.2d 1289, 1293 (1st Cir. 1993) (single conspiracy found despite separate acts, conspirator's incarceration, and more than a year between co-conspirators' communication); United States v. Moses, 148 F.3d 277, 282 (3rd Cir. 1998) (where indictment charged a conspiracy to defraud the United States from 1985-1994, alleging more than 50 overt acts in furtherance of the conspiracy between 1989 and 1994, court found one single conspiracy); and United States v. Klein, 247 F. 2d 908, 918 (2nd Cir. 1957) (court found one conspiracy existed even though there may have been divergence in intent and purpose among the conspirators in carrying out of some details, and split in view among conspirators did not constitute an end of the conspiracy.).

conspiratorial agreement. While the conspiracy shifted its means and objectives as business circumstances changed (in particular, with the efforts taken to sell DCI) the conspirators' money diversion/tax evasion activities and their concealment efforts were intertwined from the outset.

There was even evidence that part of the conspiracy throughout the charged time period was to obstruct IRS audits and conceal from IRS auditors the diversion of income to Bermuda. Specifically, the evidence established that Schussel and his co-conspirators agreed to conceal and fabricate financial records during the IRS audit of 1991/1992 and conceal the Bank of Bermuda diversion during the IRS audit in 1995. These efforts to conceal took place while the off-the-books diversion of funds offshore was still ongoing.

Furthermore, as Reed testified at trial, after the diversion to Bermuda stopped in 1996, there were no efforts to correct the prior evasion of taxes by filing amended returns or were any other steps taken to rectify the many years of evasion. Instead, during this period the conspirators met repeatedly and engaged in extensive plotting to find a way to manipulate the company's books in order to conceal their diversion of income while -- at the same time -- presenting the rosiest possible picture of their business' profitability. Indeed, even though an outside audit firm, Coopers and Lybrand, was given accurate income information for a 1996 audit of DCI, it was also given false information pertaining to DCI's 1995 income for a "review" that the firm conducted. To borrow the Supreme Court's analogy in Grunewald, such efforts to perpetuate the falsification of the books, while readying the business for sale are plainly within the scope of the core conspiracy, "just as repainting a stolen car would be in furtherance of a conspiracy to steal . . .." 353 U.S. 405.

In short, despite Schussel's zealous arguments that this case is akin to the Grunewald case by positing a putative "gap" between Schussel's tax evasion and concealment activities, the evidence

was sufficient at trial to establish a continuous conspiracy in which concealment by means of falsifying and destroying business records was part of the modus operandi from the beginning. When Kelly Jordan ("Jordan") began the IRS audit in September and October 1997, the evidence showed that the conduct of the co-conspirators, including Schussel, was part and parcel of that ongoing conspiracy. Reed gave her false DCI income statements, a fraudulent DCI general ledger, and lied to her regarding DCI revenues being deposited solely at Northmark Bank. When Jordan questioned checks payable to DCIL and Schussel's relationship to DCIL, Schussel hired attorney Edward DeFranceschi ("DeFranceschi"), whom he armed with a phony contract and false information to give to the IRS. In sum, the evidence established – and the jury was entitled to conclude – that Schussel's obstruction of the 1997/1998 audit was in furtherance of the main objective of the conspiracy that had been ongoing since 1988 as charged in the Indictment.

### 2.    None Of The Co-conspirators Withdrew From The Conspiracy.

Schussel further argues that there was no conspiracy after November 10, 1997 because Reed and Gomes had, Schussel claims, withdrawn from the conspiracy by then. Def. Mot. at 3-6. He claims that Reed had withdrawn by October 1997 by saying that she did not want to be involved with the audit, and that although Gomes had been a member of the conspiracy through January 1996, the "record is devoid of any evidence of his state of mind after DCI halted the practice of sending money to Bermuda." Id. at 4-5. In making these claims, Schussel ignores and misinterprets substantial evidence at trial showing that Reed and Gomes remained part of the conspiracy, and did not withdraw, throughout the time frame charged.[5]

---

[5] The fact that Schussel is the person who committed most of the overt acts in furtherance of the conspiracy after February 26, 1998, does not mean that there was no conspiracy. The law does not require proof of overt acts undertaken by other members of the

Withdrawal is a demanding defense requiring affirmative evidence of an effort to defeat or disavow or confess. See United States v. Potter, 463 F.3d 9, 20 (1st Cir. 2006). Typically, that requires either a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals. See United States v. Pizarro-Berrios, 448 F.3d 1, 10 (1st Cir. 2006). Mere cessation of activity in furtherance of a conspiracy does not constitute withdrawal. See United States v. Nason, 9 F.3d 155, 162 (1st Cir. 1993).

### a.     Reed.

Although Reed did not handle the audit once Schussel hired attorney DeFranceschi, she did remain involved and acted as a conduit of information between revenue agent Jordan and DeFranceschi. Schussel wrongfully equates Reed's conduct with "abandoning the enterprise and its goals." While Reed's role may have changed in that, unlike her role in the earlier two audits where she directly communicated with the IRS auditors, she nevertheless remained part of the conspiracy. Reed merely did not want to be responsible with answering the revenue agent's questions, knowing that she would not do well with "spontaneous fabrication." On the evidence presented, it is a fair inference that Reed's reason for distancing herself from the audit was motivated by fear of exposure rather than a desire to withdraw from the conspiracy.[6]

---

conspiracy within the statue of limitation in order to prove the ongoing existence of a conspiracy. Cf. United States v. Rabinowitz, 56 F.3d 932 (8th Cir. 1995) (lies to revenue agent by defendant provided basis to conclude that the conspiracy continued to time period within the statute of limitations).

[6] See United States v. Piva, 870 F.2d 753, 758 (1st Cir. 1989) (where even though the defendant returned money he was to use to purchase a vessel as part of the conspiracy, the court found no effective withdrawal because he had completed two of his duties and the return of the money was not motivated by a desire to withdraw from the conspiracy).

Furthermore, although Reed was not responsible for dealing directly with Jordan once DeFranceschi came on board, she did remain involved in the audit. The evidence showed that she continued to participate in providing information to DeFranceschi, which in certain instances was to be provided for Jordan's review. Information DeFranceschi needed for the audit, Reed would provide at Schussel's direction. As set forth in the margin below, there were numerous exhibits that showed Reed's continued involvement in providing DeFranceschi with information to be provided to the IRS, much of which was misleading and/or incomplete.[7]

Throughout the course of the audit and thereafter, Reed remained Schussel's close ally and maintained his secret about the tax evasion. At no time did she alert the IRS, or do anything to hinder the ongoing conspiracy. There were no affirmative acts by Reed to defeat or disavow the purposes of the conspiracy. In fact, after the audit was over, efforts to sell DCI continued but Schussel, Reed, and Gomes kept encountering problems because they could not show the true value of DCI. Eventually, due to their continued concealment, negotiations broke down and there was no sale. There was ample evidence from which the jury could conclude that Reed remained part of the conspiracy well after February 26, 1998.

---

[7]See Tr. Ex. 66, March 4, 1998 fax from Schussel to DeFranceschi containing draft responses to the revenue agent's questions for the March 11, 1998 letter. Schussel notes that "We will send you complete documentation when we have finished generating the answers for questions 4-7." Reed, as Schussel's right hand person, was the individual who gathered all of the information for the IRS and it is reasonable to infer that he was referring to her in "we." Also, see Tr. Ex. 71, March 12, 1998 fax from Schussel to DeFranceschi relaying information that "Diane" had reminded him of relating to the audit of Deborah Bennett and user group accounts. This information was for DeFranceschi's use when and if appropriate. See Tr. Ex. 73, April 24, 1998 fax from Schussel to DeFranceschi noting when "Diane" will be available to answer questions; and Tr. Ex. 211, January 21, 1998 note from Reed to "Ed," regarding information she has for him. It is clear from these communications that Reed remained involved in assisting Schussel and in controlling both what information was provided to DeFranceschi and the IRS, and, significantly, when it was provided.

**b.     Gomes.**

Schussel's contention that there was no evidence of Gomes' state of mind after January 1996 is belied by the evidence presented at trial. Reed testified that Gomes was involved in meetings throughout the summer of 1997 where they discussed different ways in which to destroy records and tamper with DCI's database. It was at Gomes' request that Reed maintained notes and agendas of various meetings, then shared them with Gomes.[8] Some of the discussions related to what documents to keep or lose, and others noted their concern and need to set up a plan to deal with a new buyer and potential IRS audit. In fact, after Jordan asked about the user group accounts, a meeting was held at Gomes' home (in late October or early November 1997), where Schussel, Gomes, their spouses, Reed, Stacy Griffin (Schussel's daughter) and her husband, Michael Griffin ("Griffin"), all gathered to meet with an attorney. While there, they talked about the revenue agent's questions, the possible discovery of the Bermuda diversion of funds, and the problem they were facing. Among other things, they again discussed (outside the presence of the attorney) tampering with the DCI database to delete information or make it very confusing (so that the IRS couldn't figure out the system), and what Griffin could do to the system. At that meeting, Schussel thanked everyone for being in the "foxhole" with him.

That Gomes played a less direct role in misleading the IRS after DeFranceschi was hired, in no way signaled that he withdrew from the conspiracy. He continued working at DCI, and took no affirmative steps to defeat or disavow the conspiracy. Any passivity on the part of Gomes during the audit was insufficient to constitute a withdrawal. See Unites States v. Pizarro-Berrios, 448 F.3d

---

[8] See Tr. Exhibit 33 "Who knows about DCIL" handwritten notes; Tr. Exhibit 308 "To lose by show" handwritten notes dated 6/23/97; and Tr. Exhibit 309 "Acctg" handwritten notes dated 7/14/97.

1, 10 (1st Cir. 2006) (no withdrawal from conspiracy found despite fact that defendant was in jail) (citing United States v. Robinson, 390 F.3d 853, 882 (6th Cir. 2004) (even where defendant was no longer an active participant in the conspiracy due to his arrest, he is nonetheless presumed to be a continuing member, and is chargeable for the subsequent acts of co-conspirators, so long as the conspiracy was ongoing and the defendant did not establish his affirmative withdrawal from the conspiracy)); United States v. Nieves, 322 F.3d 51,55 (1st Cir. 2003) (no withdrawal from conspiracy found where defendant merely stopped selling drugs due to her pregnancy); United States v. Maloney, 71 F.3d 645, 655 (7th Cir. 1996) (return of bribe money insufficient to signal a withdrawal from conspiracy where return of bribe was more akin to a deal gone sour than an affirmative attempt to defeat the purpose of the conspiracy); United States v. Eisen, 974 F.2d 246, 268-69 (2nd Cir. 1992) (where "in-house" investigator left firm but continued to do work for the firm on an "ad-hoc" basis, the court found that there was only "mere cessation" of illegal conduct, which was insufficient to prove withdrawal from conspiracy).

In sum, neither Reed nor Gomes withdrew from the conspiracy and Schussel's actions in impeding and obstructing the 1997/1998 audit extended the conspiracy into the limitations period. There is no basis to set aside the verdict and Schussel's motion for acquittal should be denied.

**II.    A New Trial Pursuant to Rule 33 is Not Warranted**

    **A.    Schussel Is Not Entitled To A New Trial Based On The Jury Instructions**

        **1.    The Court Properly Declined to Give Schussel's Requested Instructions 3(A) and 3(D).**

Schussel first argues that the Court erred by not giving the precise formulation of the willfulness instruction he requested in Instructions 3(A) and 3(D). In Instruction 3(A), Schussel asked that the jury be instructed not to convict unless the government proved that the defendant

"knew he had the duty to instruct his attorney" to make changes to the March 11, 1998 letter. In Instruction 3(D), Schussel requested a similar instruction, specifically, that he could not be convicted unless the government proved beyond a reasonable doubt that Schussel "knew he had a duty to reject his attorney's advice that he sign the May 6, 1998, adjustment letter." The Court, however, properly decided not to give the instructions in the precise manner formulated by Schussel.

To begin with, it is by no means clear that the requested instructions represent a correct statement of the law or were in any way appropriate under the circumstances. The relevant legal question for purposes of Counts Two and Three -- as was made explicit in the instructions themselves -- was whether the defendant willfully filed a false and fraudulent tax return for the calendar year 1995 and willfully made or caused to be made false statements to a revenue agent in order to mislead and impede the audit examination on or about March 11, 1998. See Jury Instructions at 19. Schussel's proposed jury instructions tried to reformulate the inquiry away from the legally relevant question to be posed to the jury towards an inquiry into some unspecified "duty" between Schussel and his attorney. The United States has not found any case law, nor has Schussel cited any, to support the proposition that the relevant legal duty for purposes of the tax evasion prosecution was some purported legal duty that Schussel was supposed to know that he had to an attorney. In reality, the proposed instructions – with their focus on Schussel's understanding of his duties to reject the "advice" from his attorney – were an attempt on the part of Schussel to bring an advice of counsel instruction indirectly into the case without actually requesting an advice of counsel instruction.

The Court is also entitled to reject instructions that would be misleading or otherwise cause confusion. See United States v. Lara, 181 F.3d 183, 196 (1st Cir. 1999) ("a party cannot rewardingly

13

assign error to a trial court's refusal to give a confusing, misleading, or legally incorrect instruction.") (citing United States v. DeStefano, 59 F.3d 1, 4 (1st Cir.1995)).  Here, the proffered instructions, by putting the focus on Schussel's purported understanding of his supposed duty to his attorney threatened to confuse and distract the jury from the question they needed to decide: whether Schussel acted with the specific intent to disobey or disregard the law when he gave fabricated and false information to his attorney to send to the IRS in connection with the 1998 audit.

Finally, the Court's instructions adequately apprised the jury as to what they needed to find regarding Schussel's state of mind.  The First Circuit has made clear that instructions in tax cases on willfulness do not need to follow any particular formulation.  See United States v. McGill, 953 F.2d 11, 12-13 (1st Cir. 1992) ("When, as here, the trial court's instructions adequately communicated the relevant law to the jury, the fact that some other judge might have phrased a particular point better, or more elegantly, is an irrelevancy.") (citing United States v. Montiero, 871 F.2d 204 (1st Cir. 1989) for the proposition that willfulness instruction in tax cases does not have to follow any particular formulation).  Here, the instructions specifically addressed the issue of Schussel's "good faith": "If [] you find that Dr. Schussel acted in good faith, that is, he believed in good faith that his actions complied with the law, he cannot be guilty of the offenses charged in counts two and three." Jury Instructions at 19.  The Instructions further made clear that the burden of proving intent "rests with the government."  Id.  And then, in two separate parts of the instructions, the Court made clear that the jury needed to find that Schussel willfully – "knowingly and voluntarily and with the specific intent to disobey or disregard the law" – filed false tax returns and made or caused to be made false statements to the revenue agent to mislead and impede the audit examination on or about March 11, 1998.  See Jury Instructions at 20; also id. at 16.   The

14

Instructions also excluded from willfulness any acts done out of ignorance, accident or mistake. In short, taken as a whole, as they are supposed to be, see McGill, 953 U.S. at 12-13, the Instructions adequately apprised the jury of what it needed to find on the issue of willfulness.

### 2. The Court Properly Instructed the Jury on Conspiracy and the Statute of Limitations

Schussel's argument that the Court committed error in not giving his specific jury instruction on multiple conspiracies and the statute of limitations relies on Grunewald. Def. Mot. at 10-11. For reasons noted above, it is the Supreme Court's decision in Forman that is controlling under the facts of the case before the Court. Unless and until there was sufficient evidence to warrant a special instruction to the jury, the proper question for the jury was whether the government proved beyond a reasonable doubt the defendant participated in a conspiracy as charged. Defendant's effort to artificially sub-divide the conspiracy into separate phases does nothing to clarify the issues in the case and much to invite error. See Forman, 361 U.S. at 424; see also United States v. Morrow, 39 F.3d 1228, 1233-34(1st Cir. 1994). The Court correctly instructed the jury that in order to convict Schussel of conspiracy, the government had to prove beyond a reasonable doubt that it was the conspiracy *specifically alleged in Count One* that had to be proven, and not some other conspiracy or conspiracies. See Jury Instructions at 15. The Court also instructed that the jury needed to find that one of the conspirators committed an overt act to further the purpose of the conspiracy on or after February 26, 1998. Id. at 17. Similar to Forman, where the petitioner's request for instructions on a "subsidiary conspiracy" were rejected, see 361 U.S. at 424, the Indictment in this case charged one continuing conspiracy from 1988 through 1998, and Schussel's requested charge of "multiple conspiracies" had no place in this case.

### 3. The Court Correctly Denied Schussel's Request for Instruction 10 on Literal Truth as a Defense

Proposed Instruction No. 10 – that a literally true statement could not be considered as a false statement when made in response to the revenue agent's questions in the March 11, 1998 letter – was properly rejected by the Court. Def. Mot. at 13. This instruction was not a correct statement of the law, given that, § 7201 prohibits "any conduct, the likely effect of which would be to mislead or conceal." See, e.g., Spies v. United States, 317 U.S. 492, 499. Although a false statement made to the IRS qualifies as an affirmative act, see e.g., United States v. Frederickson, 846 F.2d 517, 520-21 (8th Cir. 1988); United States v. Ferris, 807 F.2d 269, 270-71 (1st Cir. 1986); United States v. Calles, 482 F.2d 1155, 1160 (5th Cir. 1973), other statements made to the IRS with the intent to mislead or conceal could also be sufficient to establish an affirmative act. See Spies, 317 at 499. Therefore, half truths, vague responses, and claimed "literally true" statements would qualify as affirmative acts if they are willfully made with the intent to mislead or conceal. The cases Schussel relies on are distinguishable in that they deal with perjury or section 1001. Def. Mot. at 14.

Here, consistent with the relevant case law regarding false statements to IRS auditors, the Court specifically instructed the jury that in order to convict Schussel they had to find "that Dr. Schussel willfully committed both the affirmative act of filing or causing to be filed a false and fraudulent tax return for the calendar year 1995 and the *affirmative act of making or causing to be made false statements to a revenue agent* in order to mislead and impede an audit examination on or about March 11, 1998. Jury Instructions at 19-20. (emphasis added). Nothing further was required or would have been helpful.

### 4. The Court Properly Did Not Provide An Instruction That The Jury Could Not Convict On The Theory That DeFranceschi Was A Co-conspirator.

Schussel argues that the Court should have given an additional instruction stating that the jury could not convict Schussel on the theory that DeFranceschi was a co-conspirator because the government in its rebuttal "told the jury that it was not contending that DeFranceschi was innocent." Def. Mot. at 15. He argues that the failure to provide such an instruction was error because it permitted the jury to convict Schussel "on a theory of guilt of which he had no notice." Id. The Court should not accept this argument.

To begin with, the government disputes Schussel's characterization of the government's rebuttal argument. At no time did the government argue that the jury should consider DeFranceschi a co-conspirator and convict Schussel on that basis. What the government argued – properly – was that the focus of the inquiry should be on Schussel's conduct, whatever role DeFranceschi may have had. The fact that the government may have said that it was not contending that DeFranceschi was innocent is not the same as arguing that the jury should convict Schussel for being a co-conspirator with DeFranceschi. Furthermore, Schussel's claimed lack of "notice" regarding DeFranceschi's role is a red herring. From the beginning of the case, Schussel knew about DeFranceschi's role. Indeed, Schussel knew better than the government, since he, not the government, had access to all of the information regarding DeFranceschi's role.[9]

---

[9] Indeed, Schussel's "notice" argument is just a variant on his claim that DeFranceschi had to be named or otherwise identified as a co-conspirator in the indictment or in discovery for the theory to be put to the jury. Case law, however, has made clear that there is no such requirement. "It is settled law that the identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown." United States v. Penagarica-Soler, 911 F.2d 833, 840 n.5 (1st Cir. 1990) (internal quotations omitted) (citing Rogers v. United States, 340 U.S. 367 (1951)).

In any event, the instructions the Court gave protected Schussel from the problem he now claims existed, namely, that the jury would convict on the basis of finding some other, non-charged, conspiracy between Schussel and DeFranceschi. The conspiracy instructions directed the jury to focus on the actual charged conspiracy – and no other:

> If you find that the conspiracy alleged in count one did not exist, then you must return a verdict of not guilty on that count, even if you find that some other conspiracy existed and that Dr. Schussel was a member of that other conspiracy.

Jury Instruction at 16. This appropriately focused the jury on the relevant legal question: whether the government had proved beyond a reasonable doubt that Schussel was guilty of the single, ten year conspiracy as charged. Any more was not only not required, but it would have created unnecessary confusion.

### 5. The Court Properly Declined to Give Instructions Numbers 11 and 12.

The Court properly decided not to give Schussel's requested Instructions Number 11 and 12, which were requested instructions on the "attorney-client relationship." There was no basis for these instructions. The requested instructions were not a defense properly put to the jury. Schussel provided no citation to any authority authorizing such instructions or theories of defense. Although now he points to the Affidavit of Arnold Rosenfeld as support for the proposition that the instructions were "correct statements of the law," as the United States pointed out in its motion to exclude the testimony of Mr. Rosenfeld, the assertions in Mr. Rosenfeld's affidavit were highly questionable and of dubious relevance to the issues presented in this matter. Indeed, since Schussel made the decision not to call Mr. Rosenfeld, there was no evidentiary basis for him to ask for an instruction in this issue. In addition, as was the case with Instructions 3(A) and 3(D), Instructions

18

11 and 12 were attempts to insert an advice of counsel defense that Schussel claimed he was not pursuing and for which there was not a sufficient evidentiary basis to request anyway.

### 6.  The Court Correctly Denied Schussel's Requested Instruction No. 9 on Withdrawal

The Court properly rejected Schussel's Proposed Instruction No. 9 relating to his contention that he withdrew from the conspiracy no later than December 31, 1996. Def. Mot. at 18. While a defendant is entitled to instructions on his theory of the defense if he produces some evidence to support all elements of his theory, see United States v. Nason, 9 F.3d 155, 161 (1st Cir. 1993), here, there was not sufficient evidence for such an instruction. As discussed above in Section (I)(B)(2), in order to withdraw, a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy. "Mere cessation of activity in furtherance of activity in furtherance of [a] conspiracy does not constitute withdrawal." Id. at 162. The evidence at trial showed that Schussel continued to participate in the conspiracy and took steps in furtherance of the conspiracy. On the evidence presented at trial, Schussel was not entitled to an instruction on the defense of withdrawal and the statute of limitations was properly addressed in the jury instruction given by the Court. See Jury Instructions at 17-20.

**B.  The Evidence At Trial Was More Than Sufficient to Sustain the Verdict**

Although Schussel alternatively argues that a new trial is warranted because, he says, the evidence "preponderates heavily against the verdicts," he does not explain why that is so. The evidence of Schussel's participation in the charged conspiracy to defraud the United States and in the charged tax evasion scheme was overwhelming. No new trial is warranted.[10]

          Respectfully submitted,

          MICHAEL J. SULLIVAN
          United States Attorney

By:

          **/s/ Carmen M. Ortiz**
          Carmen M. Ortiz
          Jack W. Pirozzolo
          Assistant U.S. Attorneys

Date:  March 9, 2007

**CERTIFICATE OF SERVICE**

I, Carmen M. Ortiz, hereby certify that on March 9, 2007, I served a copy of the foregoing by electronic filing on counsel for the defendant.

          **/s/ Carmen M. Ortiz**
          Carmen M. Ortiz

---

[10] In a footnote, Schussel also argues for a new trial on Counts Two and Three based on a claim of duplicity. See Def. Mot. 3, fn.2. There was no duplicity, nor a basis for a new trial on that ground. See United States v. Waldeck, 909 F.2d 555, 558 (1st Cir. 1990)