UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Cr. No. 04-10060-RCL |
| | ) | |
| GEORGE SCHUSSEL, | ) | |
| Defendant. | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

# I. The Person

Because the defendant did not testify at trial, the Court saw him only through the eyes of government witnesses, one of whom, in testifying to conversations occurring ten and more years ago, left behind a less than perfect portrayal of the man. This Part I is intended to present a true portrait of Dr. Schussel's entire person.

## GEORGE SCHUSSEL

*George Schussel is an atypical defendant. He has led an exceptional life in business, in his community, and in his family. As an immigrant, George overcame significant obstacles in his youth, was educated at notable universities where he developed an interest in the emerging computer revolution, and parlayed this intellectual capital with a deep passion for teaching to build a successful business in the computer industry. In this respect, he has lived the American dream. What truly distinguishes George, however, is not the outward success he has achieved, but rather the type of human being he has been – kind, compassionate, and generous – in his treatment of his employees, in his contributions to the community, and, above all else, in his commitment to building that which he did not have in his own youth, namely, an exemplary family life.*

## Personal History

Since the probation officer has well recounted George's personal history in the presentence report, it will not be repeated in such level of detail here. Rather, only the highlights of that history will follow.

- George Schussel, 66, was born on March 1, 1941 in Nice, France, during the Nazi occupation of that country, to the union of Jack Schussel and Kate Stossel, British citizens of the Jewish faith. The defendant's father, who fought with the French resistance, was advised to leave the country because of the danger to himself and his

family.[1]  The family fled to Spain in 1942 and to the United States later that year.  For the balance of the war, the family traveled between New York City and Mexico City, Mexico due to the elder Schussel's work in importing, crafting, and selling leather goods.  In 1946, the defendant's parents were divorced, joint custody of the children was ordered, and the defendant's mother returned to France.

- George experienced a tumultuous upbringing.  George's father, who suffered from a bipolar disorder,[2] was physically abusive to both the defendant and his brother.  He also "kidnapped" the defendant in order to not comply with the Court order for visitation with his mother, moving numerous times to elude private investigators hired by George's mother and also to avoid creditors who were hounding him.  The elder Schussel married Nellie Butts in 1946,[3] and George was told that she was his real mother.  Until his step-mother's death in 1952, the family lived in West Virginia, Ohio, Texas, and Mexico City.  Thereafter, the elder Schussel and the defendant moved to California.  In 1955, riddled with debt, the defendant's father contacted George's birth mother in France and offered to allow her to reunite with her son if she would help him to get out of debt.  This she did, and George was accordingly reintroduced to his birth mother.[4]   George became a naturalized U.S. citizen in Los Angeles, California in September, 1957.

- Home schooled during his early youth due to the numerous family relocations, George entered fourth grade in public school at age eight, two full years ahead of his peers.  He was subsequently graduated from high school in California at age 16 and promptly matriculated at U.C.L.A. as a day student.  George received his B.S. in Physics (with a minor in Mathematics) from U.C.L.A. in 1961.  Due in part due to his best friend's decision to attend Harvard Law School (and also to the financial support of his birth mother), George applied to, and was accepted by, the Harvard University School of Engineering.  There, George received an M.S. in Applied Mathematics in 1962.  Later that year, George enrolled in the Harvard University School of Business Doctoral Teaching Program with majors in Economics and Statistical Decision Theory.  George was awarded his Ph.D. from this program in 1966.

- In 1964, George met Sandra Kudzi, a registered nurse who was then working as a flight attendant.  They were married the following year and recently celebrated 42 years of married life together.  Sandra, now retired, is a recovering alcoholic with 28 years of sobriety; George has steadfastly supported her sobriety.  Two daughters were born to their union:  Stacey (now Griffin), 37, and Jennifer (now Storer), 34.  Both Stacey and Jennifer are married, and each has two daughters:  Alexandra Katya Griffin, 10, and Sarah Kathleen Griffin, 5; and, Katherine Evelyn Storer, 5, and Emily Elizabeth Storer, 3. Harriet Kudzi, George's mother-in-law, has lived with George and Sandi since 1979.

---

[1] Family members included the defendant's older brother, Robert Oscar Schussel, approximately eleven years older than George.  Robert left home as a teenager, led a troubled life, and ultimately committed suicide in Paris, France in 1994.

[2] Later in life, George's father was prescribed Librium which significantly ameliorated this disorder.

[3] This was his second of four marriages.  The elder Schussel died of a heart attack at age 70 in Mexico City, Mexico in 1973.

[4] George developed and maintained a relationship with his birth mother until her death in France at age 98 in 2002.

The Schussels and the respective families of his two daughters live within 1/2 mile of each other in a residential area of Lynnfield, MA. George also owns homes in Meredith, New Hampshire and Key West, Florida. George has said that the best decision he ever made was to marry Sandra and that, notwithstanding any of his other accomplishments, "my life is my family."

- While a student at U.C.L.A around 1960, George worked part-time for Douglas Aircraft in Hawthorne, California where he was exposed to early computer systems. Attracted to the space industry, George worked during the 1960s on the Saturn rocket for the Aerospace Corporation in California, on the F-5 U.S. Air Force jet for Northrop Aviation in California, and on contracts for the Redstone Army Arsenal and Marshall Space Flight Center for Teledyne-Brown Engineering in Alabama. George was also an adjunct professor during this time at the University of Southern California and the University of Alabama where he focused on teaching computer technology to U.S. military officers. After the lunar landing in 1969, NASA's budget was cut, and George was laid off. He was hired by Informatics in New Jersey to develop financial and telecommunications software for Wall Street until the recession of 1970 saw him again laid off. George and Sandra then moved to Sandra's native Massachusetts where, from 1970 to 1980, he worked for American Mutual Insurance Company. During this time, George did database consulting work for the Federal Bureau of Prisons where he developed SENTRY, an inmate database management system still in use today. During this time, George also began offering seminar series independently on the new subject of database management software (DBMS). Out of this interest grew Digital Consulting Associates, Inc. (later Digital Consulting, Inc., or DCI) which George cofounded with Sandra in 1981. Over the next 20 years, DCI, whose main business was to conduct computer-based training seminars, trade shows and conferences worldwide for businesses in the computer industry, became a multimillion dollar business and grew to employing more than 160 people. George, an accomplished speaker, gave keynote addresses at more than 1,000 conferences and seminars, and has authored or co-authored numerous books and articles on advanced business software topics. The events of September 11, 2001 severely affected business and, by 2004 (when George was also indicted on tax evasion charges), the assets of DCI were sold off to pay accumulated debts. George has since retired from computer education but maintains a real estate management business (Jellicle Investors), and continues to do volunteer consulting work, most prominently at M.I.T.

## Personal Characteristics

*George Schussel is the rare human being who has had the passion, intellect, and vision to become a very successful businessman while at the same time being a truly kind, compassionate, and generous person in all aspects of his life. Barbara Giles, a former DCI employee, probably summarized this fact as well as anyone who has written the Court on George's behalf:*

> **[George] may be a well-known educator in the IT industry, who has received honors like the IEEE Entrepreneur of the Year (along with Steve Jobs, Bill Gates, etc.). He may have donated a professorship at MIT. He may have run**

**a multi-million dollar business. Those are all big accomplishments. But, I think the proof of the man is the other side he has shown: the example that everyone can make a difference to a charity; the interaction with his employees that kept them excited about their work; the thoughtfulness for the people who work for him by showing interest and support of their lives; the love he has for and the obvious love returned by his family. Those are the things that make a man . . .**

*Letter of Barbara Giles, #42, p. 2.*

*What follows is a selection of specific instances from the many submitted letters which illuminate the personal characteristics – kindness, compassion, and generosity – that have defined George Schussel as a human being.*

### Workplace

Even before DCI, George's personal characteristics were evident to those who worked with him. John Gluch, a former Bureau of Prisons' (BOP) employee, worked closely with George in the late 1970s and early 1980s after George had been selected as the chief technical consultant for the development of BOP's first inmate management and control computer system known as SENTRY. The success of this system, which won a Presidential Management Improvement Award from President Reagan and which is still in use today, spoke clearly to "… Dr. Schussel's ability to instill confidence in upper management, provide advice to technical staff and communicate with correctional line staff." Gluch also got to know George on a personal basis and wrote:

> During our long professional association, my wife, Sheena, and I came to know George and his family on a personal basis as well. We had occasions to visit George, his wife, Sandi, and their daughters while on vacation. The close family ties were always evident, particularly when we were on joint institution visits and he would communicate back to the home front.

> Knowing you will receive many more eloquent letters than mine concerning George's character and family matters, suffice it to say that my wife and I know him only as a consummate gentleman, devoted husband and father, man of integrity, competent professional, and old friend.

*Letter of John Gluch, #32, p. 1.*

While running DCI, George was sensitive to nonwork issues employees faced and often made accommodations for the employees. Jim McConville, who has worked for ten years maintaining George's residential property in Lynnfield, wrote of the many instances when George has allowed him to work a flexible schedule so that he might attend his son's sporting and other events. He wrote: "Because of this I have never had to miss a game, practice, or school event. I am one of the few lucky fathers who have had the chance to really participate in

raising a son." *Letter of Jim McConville, #24, p. 2.* In a similar vein, former DCI employee Sara Mulvihill wrote:

> I have known Mr. Schussel since April of 1987 when I was hired by his company, Digital Consulting, Inc. (DCI), as a Conference Coordinator. I worked full-time for DCI for only 1½ years before starting a family with my husband. At that time, and for the next 16 years, Mr. Schussel allowed me the flexibility to continue my career working as an on-site facilitator for DCI, while also raising my 4 children. I was literally able to choose the events that fit my schedule. It was clear to me and to my colleagues who were working in a similar fashion that Mr. Schussel fostered a culture of family first. He is a caring, compassionate man who treated all who worked for him as a member of his family.

*Letter of Sara Mulvihill, #54, p. 1.*

George's compassion and generosity was particularly evident when employees faced personal or family tragedies. Stacey Griffin, George's daughter, recounted the story of Alan Holmes:

> DCI, my father's company, bought a travel agency in the early 1990s. They also hired that company's primary agent, Alan Holmes. After the company was acquired, it was discovered that Alan's previous employer had been pocketing the social security money he had been withholding. After his previous employer went bankrupt, Alan had no way of recovering the money.
>
> My father made a vow to Alan to keep him employed as long as he could, so he could build up his social security reserves. When Alan became sick with Chronic Obstructive Pulmonary Disease (COPD), leaving him in a wheelchair, and in need of constant oxygen, his ability to work was severely incapacitated. . When Alan's manager wanted to fire Alan, my father stepped in and said, no—Alan wants to work, and he is a good employee who needs help, so we will not fire him.
>
> So, what happened? My father set up an easily accessible work area for Alan, gave him a low-stress job, continued to pay him for full-time work, and then allowed him to come to work when he could, if he could. Many days when Alan couldn't drive, my mother would pick him up and drive him. This continued to the day he died, allowing his widow to fully benefit from his social security. Other workers at the office couldn't understand why we kept Alan on, but of course, I did. The "secrecy" around Alan's situation was to protect him. This is just so typical of my parents, and my father.

*Letter of Stacey Schussel Griffin, #3, pp. 3-4.*

Allis Whittier, a former employee, wrote:

> … [T]wo years ago, my mother was dying at the young age of 57.  On several occasions George would come to my office or call to ask how my mom was.  As her illness progressed, George would often tell me to leave the office so that I could spend time with her.  I never had to use vacation time or sick time to do this.  Now that my mom has passed away, I often look back and cherish those afternoons I was able to just sit and be with her.

*Letter of Allis Whittier, #15, p. 1.*

Another former employee, Barbara L. Gavin, related in her letter the story of an employee who had contracted cancer:

> Late in the 1990's (sic) one of our colleagues contracted virulent breast cancer.  Allison was young mother of two toddlers whose husband had a blue job.  George insured that Allison and her family had everything they needed up to her death and afterwards.  That I don't know the details of his support is a tribute to George's quiet philanthropy and the gracious, elegant nature of his friendship.  We all just knew that George was there for Allison.

*Letter of Barbara L. Gavin, #51, p. 1.*

Suzanne M. Countie, a former employee and friend, experienced the tragic loss of her son in a brutal murder.  She wrote:

> Family means the world to George.  He has always instilled in me that family comes first.  He preaches it – but more importantly he lives it.  He and his family have opened up their hearts and home to mine.  Personally I have recently gone through a huge tragedy whereas I lost my son in a horrific crime.  In keeping with his true self, he contacted me immediately to lend me his support and compassion.  Like him, his ENTIRE family rushed to our side, cooking dinners, caring for my kids and offering to do anything we needed to help us through.

*Letter of Suzanne M. Countie, #35, p. 1.*

Perhaps the most poignant example of George's compassion and generosity, however, is reflected in the letter from Margaret L. Mottolo:

> The best example of why George deserves some consideration as a man who is not myopic and self serving comes from what he did for me when I was no longer his employee and it did not benefit him.  My husband was diagnosed with a brain tumor in 2002.  He was 42, starting his own company and we had three small children.  We very quickly found ourselves in a terrible financial situation with no income and depleted savings.  My friends from DCI came to our aid by organizing an amazing yard sale involving donations from dozens of families with the proceeds to benefit our family.  George very generously offered the use of his Andover office location for the storage of all the donations for days leading up to

the sale as well as for the sale itself. He authorized a number of employees who were friends of ours to work on this event during their work hours. They used company time and resources to organize the sale, pick up donations and set them up for sale. George and his entire family also worked very hard to make the sale a success. They worked before the sale, sorting and pricing items and the day of the sale they were all there from very early morning until the evening working.

In addition to contributing his personal time and resources, George generously matched the proceeds of the sale with a personal check. This was significant as it provided much needed financial and emotional relief, allowing me to focus more on caring for my husband and less on worrying about paying the bills. It was far more than anyone would expect from most former employers. When my husband died one year later, I felt a similar outpouring from him and his family. George remembers the names of my daughters and asks with sincerity about their well being. Many men who have had successful careers do not sit down and talk to children when they can be talking about themselves, - George is happier talking to my girls and talking about his own grandchildren than any other topic. He has continued to stay in touch with us and frequently asks with great sincerity if there is anything we need, a question few people bother to ask three years later. He has made it very clear that if I ever require further assistance, he would do anything he could to help my family.

*Letter of Margaret L. Mottolo, #17, pp. 1-2.*

George has also been a mentor to many employees over the years. Michael Colby wrote that George's having "taken him under his wing" turned out to be "a turning point in my life." *Letter of Michael Colby, #33, p. 1.* Ken Lownie acknowledged that George has been a "direct mentor' to him for over 20 years during which time Lownie has built several businesses and is currently the chief operating officer of a technology company. *Letter of Mary and Ken Lownie, #44, p. 2.* The letter from Daniel E. Moran offers probably the best example of the direct impact George has had on how Moran conducts himself in a new business setting:

At the age of 47, I found myself in a serious health situation and had to undergo heart surgery and a significant length of rehabilitation. Many companies would, I am afraid to say, write me off. I was devastated.

Not [George]. I was coming home from the hospital literally walking in the door, the phone rang; it was him (<u>sic</u>). He watched over me, and encouraged me. He would always check on me. When I would work to excess, he was right there to bring sense to me. He was always there – 24/7 – as not only the owner of the company, but my friend, and he remains my friend and confidant (<u>sic</u>) today.

I learned from [George] the meaning of respect & caring from a whole new level, and I practice this everyday in my current role as Vice President of Human Resources for a company in Upstate New York. I look at employee issues differently; I know everyone, their families and I love what I do.

*Letter of Daniel E. Moran, #34, pp. 1-2.*

By virtue of owning properties in Meredith, New Hampshire and Key West, Florida, George has had maintenance employees in both locations. They, too, have written of George's generosity and compassion. Ted Bowman, a painting contractor and champion sailor, wrote:

> I moved to Meredith in 1987 and started Meredith Bay Painting. Due to the economy this was a difficult time to start a business. By 1990 I found myself in debt and one week from being homeless. A friend told me of a man named George Schussel who might have a place I could stay. In the summer of 1990 George graciously offered me three things; a place to live, annual painting work, and access to the lake for my sailboats. This was an incredible gift and the break I needed to pursue a life in the lakes region.

*Letter of Ted Bowman, #18, p. 1.*

Noni R. Smith, also of Meredith, detailed her association with George and his commitment to her and her late husband:

> I met George Schussel during the summer of 1977 when my husband was Property Manager for George's residence on Lake Winnipesauke (sic). I worked with my husband on George's property as landscaper and painter. During that time I found George to be a very caring and warm person. My husband, Paul, had been dealing with cancer for many years and George was very supportive of him and helped him deal with the various medical and emotional issues he faced.

> Before my husband died in March 2002, George promised Paul that he would "watch out" for me. I have been the Property Manager ever since. George has assured me that this position is mine for as long as I wish. He has steadfastly kept his promises to Paul and to me. Over the years I have looked to George for guidance and emotional support and he has never let me down.

*Letter of Noni R. Smith, #20, p. 1.*

In Key West, Debra Burns has been the Schussels' property manager since 1998. Within a year after accepting the position, Burns found herself without a living situation due to the dissolution of a relationship. George and Sandi offered her a place to live during this difficult time in her life. *Letter of Debra Burns, #22, p. 1.* The Schussels often spend the Christmas holidays with their extended family in Key West. Burns's husband, Courtney Aman, offered a particularly insightful example of George's generosity of spirit in a letter written to the Court:

> During the holidays I drive to Orlando to visit my family for a week. Part of my wife Debbie's job entails her being in Key West when George is in town, so I just go by myself. I am always back in Key West at least a couple of days after Christmas. And every year George and his family wait until I get back to town so

that my wife and I can join them for Christmas dinner and opening presents with their family. I cannot begin to tell you how humbling this is for me. Humbling, not because he went to Harvard and I went to community college. Humbling, not because he was a CEO and I am a painter. I am humbled because a man who cares so deeply about his family would include us in such an intimate family affair. I could write volumes of examples of this sort.

*Letter of Courtney Aman, #16, p. 1.*

## Community

George has always been an active and generous participant in the communities in which he has resided. These activities have included, but are not limited to, supporting a program to provide presents at Christmas to those in need, expanding computer access in public schools, supporting conservation efforts in New Hampshire, participating in hurricane cleanup and developing affordable housing for workers in Florida, and endowing a chair at M.I.T.

Matthew J. Powers, a friend and former employee of DCI, wrote of George's efforts with respect to the Neighbors in Need program:

> As CEO at DCI, George spearheaded a program called Neighbors in Need, where we as employees would buy toys at Christmas for the less fortunate. I know first hand how important this project was because I delivered the toys every year and all the children would be there waiting for us to arrive. It was a great cause and provided a Christmas for a lot of people who otherwise would go without. It was never divulged to us, but we all knew George took several of the children's names to buy for.

*Letter of Matthew J. Powers, #39, p. 1.*

George has also lent his resources to improving computer and Internet access in the public schools. Stacey Griffin, George's daughter, related the story of George's and DCI's participation in "Net Day":

> In the mid-1990s, Chicago's Mayor Daly issued a call to action for computer-based businesses to donate time and money to introduce computers into public schools. Boston's Mayor Menino took up this call, and initiated an annual "Net Day" to be held in Boston, with a goal of wiring all Boston schools with internet access, and to insure one computer for every four students.
>
> My father rose to the challenge by soliciting volunteers, and sending several staff members, including my sister and myself, during paid working hours to wire several schools. He also donated numerous computers to this cause. He repeated these efforts in Chicago, again paying employees to work in the schools, and donating computers. Both Mayors Daley and Menino personally visited and

thanked my father for his dedication to improving schools by providing internet access for hundreds of children.

*Letter of Stacey Schussel Griffin, #3, p. 4.*

In New Hampshire, George has been particularly active in conservation efforts. According to Mark B. Billings, a friend and neighbor, George helped establish the Meredith Preservation Association, "a community watchdog group focusing on a number of environmental issues jeopardizing the lakes region of New Hampshire." The group has accomplished a number of its goals, including reducing aggressive boating and acquiring land to protect it from development in environmentally sensitive areas. *Letter of Mark B. Billings, #40, p. 1.* George Serrano, another friend and neighbor, wrote of George's contributions to the group:

> George rose to a leadership role in our campaign to conserve a precious natural resource. He quickly gained the trust of neighbors and became our source of guidance and confidence. He has given enumerable (sic) hours of his personal time and has been extraordinarily generous with his financial support. Everyone involved in this neighborhood effort has nothing but the deepest respect and admiration for George.

*Letter of George Serrano, #48, p. 1.*

In Florida, George has become involved in developing affordable housing for workers, a scarce commodity in the Key West area. Raymond and Caroline Vazquez, business associates and neighbors there, wrote of George's efforts in this regard:

> A little over a year ago, a friend with an engineering background came to us with the idea of putting up a building with affordable housing units for workers in Key West (where much real estate is not affordable for people with typical jobs). We needed another partner to make this happen and George's name came up as a potentially interested investor and partner. He was very interested in the project and our team has just received final approvals from all of the town's boards to proceed with this important development on White St. It would have never been possible for us to proceed with this effort without George's active support.

*Letter of Raymond and Caroline Vazquez, #21, p. 1.*

The Vazquezes went on to cite another important (if more mundane) area, i.e., hurricane cleanup, where George has actively participated:

> . . . [George] has never been hesitant about rolling up his sleeves and doing the dirty work that needs to be done. We saw this clearly during the terrible aftermath of the four hurricanes that hit Key West in the fall of 2005. While we weren't as devastated as New Orleans was by Katrina, Hurricane Wilma flooded our neighborhood under three feet of sea water and caused huge damage to all of our homes. George and Sandi weren't in Key West that October 30, but as soon

as they could, they flew to Miami, rented a car and brought it down to Key West. Our town of Key West had essentially no running vehicles left after Wilma. Being buried under sea water had pretty much ruined all of the vehicles in Key West. The Schussel's went to work ferrying people around, retrieving supplies, pushing brooms to clean up and doing anything they could to help our neighborhood to recover.

*Letter of Raymond and Caroline Vazquez, #21, p. 1.*

Perhaps the most important monetary contribution George has made, because it will exist in perpetuity, was his and Sandra's contribution of $2 million in 1999 to the M.I.T. Sloan School of Management to establish the George and Sandi Schussel Professorship of Management and Information Technology. No strings were attached to this contribution. Erik Brynjolfsson, the current Professor of this Chair, wrote as follows:

George and Sandi generously endowed this chair at MIT and it has enabled me to do research on the role of information technology in improving the nation's productivity, on technology and inequality, on how the Internet can in some cases increase "balkanization" and isolation, on the measurement of social networks, and on the importance of organizational and human capital as key assets in our economy. This work has won nine "best paper awards", including three this past year and has been cited by thousands of academics and the business press as well [as] government leaders . . .

*Letter of Erik Brynjolfsson, #29, p. 1.*

## Family

While George has been an unusually compassionate, understanding, and kind human being to his employees and has also made notable contributions to the communities in which he has lived, it is his commitment to his family which has truly been exemplary. Many persons outside his family who have written to the Court have attested to their observations of this fact. Many believe that George has given his family that which he did not have in his youth, namely, stability, nonjudgmental understanding, commitment, and love. Testimony of family members, some excerpts of which follow, offers particular insight into George's devotion to his family.

Sandra Schussel, George's wife of 41 years, concisely recounted their respective personal histories and how George has become "the heart of their family." Those experiences formed the background for their determination to always give first priority to family. She is particularly grateful for the manner with which George has treated her mother, now 89, who has shared their home for the last 28 years. Moreover, while they have enjoyed the fruits of George's outward success in the business world, their journey has nonetheless not been without difficulties. Sandra cited a personal example in this regard:

During the mid 70's I worked at the Greater Lynn Mental Health Outreach Unit as a nurse/school psychologist. During this period many of my immediate family

members were dying – from many causes, including alcoholism.  In spite of my work and RN training, I turned to alcohol to self medicate.  This was a desperate time for me.  My husband was there for me – always.  On the day my dad died I went to an AA meeting with George by my side.  No judgment on his part, just support, and unconditional love.  George has been going with me to AA meetings for 28 years – the length of my sobriety.

*Letter of Sandra Schussel, #2, p. 2.*

        George's daughters, Stacey and Jennifer, have written particularly pointed and loving letters of the impact their father has had on their lives.  Like their mother Sandra's letter, theirs must be read in their entirety to be fully appreciated.  One example from Jennifer's letter touched upon the international flavor of the education she received by attending many DCI conferences all over the world and by her participation in the Samantha Smith World Peace Camp.  She wrote:

> All of these international experiences encouraged me to apply for a youth ambassador scholarship to Jordan and Kuwait from the Council on US and Arab Relations.  Though nervous about my safety in this turbulent part of the world, my parents were incredibly supportive of my desire to travel, live, study in the Middle East.  Despite his Jewish background, nothing could stop my father's desire for me to help build bridges between people of different cultures and backgrounds.  He has always strived to build bridges and help people; always interested in meeting, learning about, and helping from other cultures and societies.

*Letter of Jennifer Schussel Storer, #6, p. 2.*

        Stacey, in her letter, told of the special bond that has developed between her youngest daughter, Ali, who suffered significant birth trauma, and George:

> My oldest daughter, Ali, was born two weeks late, and suffered several strokes during delivery.  This left her with brain damage.  She was born not breathing, and after her resuscitation, began experiencing constant seizures.  Ali spent two week in the MGH NICU in 1997, finally coming home on anti-seizure medicine that made her drowsy and reluctant to eat.  My father was there for me, every step of the way.
>
> When my husband was busy working the summer after Ali's birth, I actually moved into my parents' home for two months so that they both could help out—I was a first-time mom faced with a scary situation.  My father had a special way of playing with Ali that could calm her down immediately.  When I couldn't, wouldn't, leave her with a babysitter, I could reliably leave my baby with my father.  That special bond between the two of them exists to this day, offering Ali, who faces challenges in life, a safe haven outside of her immediate home.

*Letter of Stacey Schussel Griffin, #3, p. 2.*

It is clear that George has a special relationship with, and enjoys, all four of his granddaughters. In this connection, Ali's paternal grandfather, Tom Griffin, recounted a playful side of George he has directly observed but which many others have not seen:

> It's been a delight through the years to watch George in his role as a grandfather. One moment he could be popping out of a closet with a gorilla mask on, sending four screaming little girls running through the house, and the next moment, he would be reading them a bedtime story. George had no problem dressing up in a full size costume as Tinky Winky, the purple teletubby, for his oldest granddaughter's third birthday party (she just loved the teletubbies.). He modified a Barbie battery powered jeep for better traction so their little faces would distort from the G-forces generated (alright, the real reason is that it was slipping on the pavement). He'll go over to see the girls a half-hour before bedtime and spool them up by wrestling with them, and then leave. (This is how we, as grandparents, get even with their parents for all the aggravation they caused us during their teen years.)

*Letter of Tom Griffin, #10, p. 1.*

George's sense of family obligation is not limited to his immediate family members, however. Two stories illustrate this particularly well. Over 20 years ago, Karen Crowley (now Coffey), Sandra's cousin, lost her husband and nine year old son, in an automobile accident. This tragedy left Karen alone with her then six year old daughter, Casey. *Letter of James and Karen Coffey, #13, p. 1.* Casey then described what happened:

> George and Sandi Schussel immediately stepped in and took care of us with such amazing love and support. They were there to wipe away tears and help us deal with our grief. At the time, I was too young to comprehend that my mom and I were left in some financial distress on her one income. However, years later she revealed how George reassured her that he would make sure that we could live comfortably in our own home. Another memory of that time was of George giving us one of his cars when our remaining vehicle ceased to operate – again, I later found out that he wouldn't accept a dime from my mom.

> George definitely was a father-figure in my life after the accident. He treated me like one of "his girls" and helped me feel more stable. George and Sandi had me stay with them at their home in New Hampshire for the following summer and without a doubt, those months were vital to my healing process. George took me on boat rides, cheered me on when I dove off the lake dock, drove me around on their all-terrain vehicle, and overall, helped me to just feel like a kid during a time when life felt very heavy. I don't think that I will ever be able to thank him and Sandi enough for all that they did. To this day, George and Sandi's home at the lake is one of my favorite places in the world. When I pull into the driveway, I immediately feel love, warmth, and a sense of security.

*Letter of Casey L. Spicer, #12, pp. 1-2.*

The second story involves Ryan Morash, the older of two sons of Susan K. Morash, another of Sandra's cousins. As Susan describes it:

> Ryan suffered with severe learning disabilities his entire life. He attended specialized schools outside of his home district and had great difficulties socializing and making friends. George came to realize that Ryan had a great affinity for computers and since George was so gifted in this area, he used this as an opportunity to bond with Ryan and mentor him. He identified that if Ryan could have the opportunity to meet other children with this same interest, it might enable him [to] make friends. George generously helped my husband and me to send Ryan to a "sleep away" computer camp one summer. Given Ryan's issues, we were very anxious about him being able to make friends or even manage being away from home, but George encouraged us to give Ryan this chance. This experience at computer camp would become a life changing experience for my son. For the first time he made friends with children that shared his same interest and passion. Many of these children also experience difficulty making friends, but their common interest in computing became the vessel for them to socialize with peers for the first time. Without George's generosity, it would not have been financially feasible for us to afford this camp. I will always be grateful that he recognized this opportunity and the need for Ryan to make friends.

*Letter of Susan K. Morash, #14, p. 1.*

George's interest in Ryan's situation continued beyond this computer camp experience, however. In the summer of 1999, George hired Ryan as a technical worker at DCI. Ryan describes the impact this experience had on him at that particular juncture in his life:

> . . . [D]uring this time, I was going through some of the worst depression of my entire life. Getting an opportunity to do what I loved doing, in an environment that meant something was more meaningful than anything else to me then, and the fact that he decided I was good enough to work for him meant the world to me. Working there reinvigorated me enough to get my life back on track and get my grades up, allowing me to get into all the colleges he directed me to. I have never forgotten that experience and the good it did for me.

> . . . [T]his man is one of the biggest reasons I am going to graduate from college this May. I have looked up to him as a mentor my entire life, and if it weren't for his guidance and help, I would probably have stood a far worse chance of succeeding today. I probably would not have made it this far without his help-instead, I probably would have ended up in a low level technical college or simply working in a fast food line somewhere. I hope my letter describing my feelings about my Uncle George will help you to better understand the good man that he is . . .

14

*Letter of Ryan Morash, #11, pp. 1-2.*

In the end, the most compelling family testament to George is that of his mother-in-law, Harriet Kudzi, 89. Mrs. Kudzi, whose own schooling was cut short by family obligations during the Great Depression, was forced to return to work after her only daughter Sandi was born because of her husband's illness and endured a long marriage with an alcoholic husband. After his death in 1979, Mrs. Kudzi began living with the Schussels and has been there ever since. She described their relationship:

> Even though George is my son-in-law, he is truly my son. I have lived with George and Sandi, my daughter, for 28 years, having moved into their home shortly after being widowed. How many son-in-laws (sic) would willingly, happily take in their mother-in-law into their own homes, to share a living room, kitchen, and life with for several decades? How lucky I have been to have had George in my life. He and I have "adopted" each other as family—me having no son, and him not having any true mother. We have become that to each other over the many decades.

*Letter of Harriet Kudzi, #1, p. 1.*

Her letter goes on to tell of affronts to George by Mrs. Kudzi's in-laws due to George's faith, the kindnesses and nonjudgmental understanding George always accorded her husband, George's devotion to his own mother in her last years in France, and his always being there to help her in an emergency. "[George] is the most terrific son a mother could hope for." "This," she wrote, "is the blessing that George has been in my life." *Letter of Harriet Kudzi, #1, p 2.*

## II. The Offense

Just as George Schussel presents as an atypical offender, so too is his offense atypical.

This, for the following reasons:

### A. Voluntary Cessation

As Ronald Gomes testified at the pretrial hearings before Magistrate Judge Alexander, it was George Schussel, in the face of opposition by Mr. Gomes, who insisted on the full reporting of all revenue for the years 1996 and thereafter. (Hearing Transcript, 5/13/05, at p. 33). As Mr.

Gomes put it, he wanted to "go gray," whereas Dr. Schussel wanted "to go from black to white," that is, total compliance with law; and it was "black to white" that prevailed. Ibid.

**B. The Determination to File Amended Returns**

Almost immediately after the audit by Revenue Agent Jordan began, Dr. Schussel informed his attorney, Edward DeFranceschi, of his wish to file amended returns. The advice at the time was that the filing of amended returns was not then appropriate. Soon thereafter, this time in writing, by fax transmitted December 7, 1997, Dr. Schussel importuned his lawyer again to consider filing at least his personal returns (Exhibit A). Once again, he was put off, to await the close of the audit.

Then, at the audit's close, on May 6, 1998, a meeting was held at which were present Dr. and Mrs. Schussel, Mr. and Mrs. Gomes and both lawyers, Edward DeFranceschi and Kenneth Glusman. One of the items on the agenda was the filing of amended returns, that being the intent of all four taxpayers.

The discussion concerning the refiling was described by Mr. Gomes at the pretrial hearing as follows:

"Q    What did you remember of the advice that Mr. DeFranceschi gave you?

"A    His advice was not to re-file.

"Q    Did he use any memorable phrase in terms of that advice?

"A    Right. They were, it was in that context that he said if you re-file, we had pushed, we being, we had pushed to say we thought we should re-file and he said two things. One, once audited, it's

unlikely that it would be reopened. And two, when we pushed he said if you re-file you give the IRS and [sic] ax to chop you into little pieces. That was very memorable.

……………………………………………………………………

……………………………………………………………………

……………………………………………………………………

"Q      Let me ask it another way. Did you and Dr. Schussel as a result of Mr. DeFranceschi's opinion, discuss whether or not you would re-file or not to re-file your 1995 tax returns?

"A      When Mr. DeFranceschi made that comment - -

"Q      About the ax - -

"A      You could have heard a pin drop.

……………………………………………………………………

……………………………………………………………………

……………………………………………………………………

"A      As I said, you could have heard a pin drop in the room. I, we may have had additional discussions or whatnot, but I think we all knew that was the advice and unless we had something much stronger that was the thing. It is – I think, I think it was decided we would not, it was decided that we would not file based on that, that, that's what you're getting at?

"By Mr. Weinberg:

"Q      Yes, and based on that because we're speaking in some

respects to - -

"A      Based on the advice of our counsel and the emphatic nature

of it, he cut off the discussion and that was the discussion."

Pretrial Hearing Transcript, 5/12/05, pp. 112-114.

Attorney Glusman testified to the same effect, id, 5/13/05, pp.13-14, and Magistrate

Judge Alexander found as fact that the amended returns were never filed "[o]n Mr.

DeFranceschi's advice." Findings, etc. (Docket #20), p.11.

## C. The Tax Payment

After his indictment and the receipt, shortly before trial, of the government's calculation

of his tax deficiency, the defendant once again sought legal advice on the procedure for payment

of his taxes. This time, his desire to make things right was not thwarted by his lawyers. On

December 28, 2006, undersigned defense counsel forwarded to the IRS defendant's check in the

amount of $3.5 million. This amount was arrived at on the basis of the total amount of

unreported income, as reflected in the deposits to DCIL's Fidelity account, and after the

adjustments described in Section III, below. If the Tax Court should determine that a deficiency

still remains, the defendant is, of course, fully prepared to make prompt payment in full,

whatever the amount may be.

## D. Role of Counsel

Whatever else may be said of "false and misleading information" given to his attorney

(Gov.'s objections of 5/10/07 to PSR), it is indisputable that (1) Diane Reed was instructed to

make a 100% full disclosure of the facts to Mr. DeFranceschi and (2) Mr. DeFranceschi knew

full well, when he wrote his letter of March 11, 1998 (Exhibit B), that (a) although Dr. Schussel directly owned only one share of DCIL, he controlled all 12,000 shares and (b) payments to DCIL, deposited to its Bermuda bank account, were not made in accordance with the terms of the contract dated September 10, 1993.

Notwithstanding this knowledge, Mr. DeFranceschi, in his letter of March 11, 1998, wrote:

> "1..........In 1988, at the formation of DCIL, he [Dr. Schussel] received one share of one dollar par value stock out of 12,000 issued and outstanding.
>
> ……………………………………………………………………………
>
> ……………………………………………………………………………
>
> "7. There were no invoices. Payments were made pursuant to the contract previously provided to you."

It was these two responses on which, according to her testimony, Revenue Agent Jordan principally relied in determining that DCIL was independent of DCI.

In justification of these representations to Ms. Jordan, Mr. DeFranceschi testified at trial, first, that his statement that Dr. Schussel "received one share of….stock" was literally true, and the literal truth is the truth, and, second, that his statement that "Payments were made pursuant to the contract…" was intended to represent only that the contract was a document that was in existence at the time that the payments were made.

The two statements, of course, say much more. But none of this is to say that all blame belongs to Mr. DeFranceschi. As the verdict implies, the jury found that (1) Mr. DeFranceschi's explanatory testimony notwithstanding, the two representations on which the revenue agent

relied in closing her audit were false and (2) Dr. Schussel knew it as well as did Mr.

DeFranceschi. Even so, it cannot be denied that the letter was written by Mr. DeFranceschi, over

his signature, and that the final decision as to its content was his.

Only two months later, on May 6, 1998, when given a second chance to serve both his

client and his oath to uphold the law, Mr. DeFranceschi again failed. Had he, on that date,

rendered competent and ethical advice, the amended returns would have been filed and Dr.

Schussel would have been protected from criminal prosecution by virtue of the Treasury's

Voluntary Disclosure Policy.

Although Mr. DeFranceschi's advice was couched in terms of his client's best interest –

refiling would "give the IRS an ax to chop you into little pieces" – it is now quite apparent that

his true motivation was rather his own protection. Treasury Department Circular No. 230, 31

C.F.R., Subtitle A, Part 10 (rev. 6-20-05), which regulates practice before the Internal Revenue

Service, provides, in part, as follows:

> §10.51 Incompetence and disreputable conduct.
>
> Incompetence and disreputable conduct for which a practitioner may be censured, suspended or disbarred from practice before the Internal Revenue Service includes, but is not limited to--
> …………………………………………………………
> …………………………………………………………
> (d) Giving false or misleading information, or participating in any way in the giving of false or misleading information to the Department of the Treasury or any officer or employee thereof, or to any tribunal authorized to pass upon Federal tax matters, in connection with any matter pending or likely to be pending before them, knowing such information to be false or misleading. Facts or other matters contained in testimony, Federal tax returns, financial statements, applications for enrollment, affidavits, declarations, or any other document or

statement, written or oral, are included in the term "information."

Since Mr. DeFranceschi was not the taxpayer and, therefore, not subject to the protection of the Voluntary Disclosure Policy, the filing of the amended returns would have exposed him both to criminal prosecution and disciplinary action by the Treasury's Director of Practice. From this, there is only one conclusion: Mr. DeFranceschi's advice was guided by the best interests not of his client, but of himself.

Taking it from Dr. Schussel's point of view, everything points to his choice of counsel as being guided only by the best intentions. He originally sought legal advice from Attorney Kenneth Glusman of the widely known and prestigious Brown Rudnick law firm. Mr. Glusman then referred him to Mr. DeFranceschi, who was introduced as an experienced tax lawyer, a former employee of the Treasury Department and an instructor in tax law practice at the graduate school of Boston University Law School. Thereafter, upon his entry into the case, and on Dr. Schussel's instruction, Mr. DeFranceschi was accorded the full cooperation of Ms. Reed, who made full and truthful disclosure to him of all the facts.

Against this background, it would seem safe to say that, had Mr. DeFranceschi been true to his credentials, the letter of March 11 would have been written differently, to say the least, and the amended returns would have been filed. It seems equally safe to say that, except for his choice of counsel, Dr. Schussel would not now be before this Court. At the very least, it should be safe to say that Mr. DeFranceschi's part significantly diminished Dr. Schussel's role in the offense.

### III. Guideline Calculation

Virtually the entire content of the defendant's letter of May 11, 2007, objecting to portions of the preliminary PSR, is addressed to the government's guideline calculation. That letter, in its objections to paragraphs (91) through (94) of the preliminary report, sets forth the defendant's calculation of the appropriate guideline range. The letter is included in the revised PSR, and in the interest of avoiding unnecessary repetition, the Court is respectfully referred thereto, with the following, short addendum:

First, with respect to the tax computation, appearing in paragraph (91) of the defendant's May 11 letter: Because the exhibits attached to that letter were not included in the revised version of the PSR, they are here attached as Exhibits C, D, and E. Exhibit C is a photocopy of the Fidelity statement showing the initial deposit of $400,000, on December 22, 1987, which derived from Dr. Schussel's personal funds. Exhibit D shows the two 1991 contributions to the Fidelity account, for $200,000 and $110,516, respectively, drawn from Dr. Schussel's personal account. Exhibit E is the check dated April, 1992 in the amount of $500,000, representing a transfer from the account of Dr. Schussel's mother.

These personal contributions total $1,210,516. On January 1, 1996, the balance in the Fidelity account was $8,191,000. Therefore, without even adjusting for interest compounding over the years, it is apparent that the maximum possible amount of unreported taxable income is something less than $7 million, producing a $1,960,000 tax deficiency (28% x $7 million), which, coincidentally, closely approximates $2,000,000 donated by Dr. Schussel in 1999 to the Massachusetts Institute of Technology.

Secondly, in its objections to the preliminary PSR, the government states, "The work that Schussel did for DCI was handsomely compensated in a yearly salary that was received." The

issue raised by this statement is directly related to the double-taxation issue. What the government fails to appreciate is that DCI conducted a service business. As such, unlike a business engaged in the production of goods, it required no significant investment in plant or machinery. It needed only office space and furnishings, all of which was rented or purchased incrementally from cash flow as the business grew. But first and foremost, its business being intellectual, it needed intellects. In this case, it was one intellect, that of Dr. Schussel, that drove the business. As Ms. Reed put it, Dr. Schussel was the "brain trust." He was not merely a stockholder/key employee. He was the whole business. Without him, there was nothing. Thus, had he received the unreported funds from DCI, there could be no question but that they represented reasonable compensation.

The fact is, however, that the money deposited to the Bermuda account was not received from DCI. Since he had no employment contract with DCI, Dr. Schussel was free to engage in any business he liked, including competing businesses. And this he did. While DCI ran its conferences, Dr. Schussel created ideas for, and ran, his own conferences, in the form of so-called "User Groups." It was he who invented the User Group business, wrote the marketing, sold the concept to key software firms and keynoted the events. The profits therefore belonged to him, not DCI, and were paid to him through DCIL. Nothing passed through DCI, and no funds were paid by DCI to Dr. Schussel. There is, therefore, no issue whether the funds should be treated as compensation or dividends received from DCI. And if it be said that Dr. Schussel received clerical assistance from DCI in conducting his User Group conferences, it would mean only that money is owed by him to DCI in payment for that service; in which case, DCI's income would be increased and Dr. Schussel's correspondingly decreased.

## IV. Departures and Statutory Factors

The Court has before it a man who has made important contributions to the nation's technological advancement and, at the same time, has given generously of himself to his community; who, but for the conflicted advice of an otherwise superbly qualified lawyer, would not now be before this Court. Both the offender and the offense being uniquely atypical, the defendant proposes a sentence significantly below the guideline range for the following reasons:

1.     "[T]he nature and circumstances of the offense and the history and characteristics of the defendant," 18 USC § 3553 (a)(1), as set forth in Parts I and II of this memorandum, mitigate heavily in favor of a non-guideline sentence.

2.     In view of the defendant's voluntary, pre-discovery cessation of false filings, beginning in 1996, his good faith attempts to file amended returns for the pre-1996 years, his payment of $3.5 million against his tax obligations, and the role played by his attorney in subverting the 1997-1998 audit and thwarting the filing of the amended returns, (a) the tax loss overstates the seriousness of the offense, and (b) there exist mitigating circumstances of a kind and to a degree not adequately taken into consideration by the Sentencing Commission that should result in a sentence dramatically different from that prescribed by the Guidelines.

By his attorneys,


/s/ Francis J. DiMento
Francis J. DiMento
BBO No. 125000
DiMENTO & SULLIVAN
7 Faneuil Marketplace, 3rd Floor
Boston, MA 02109
Tel. (617) 523-2345

/s/ Martin G. Weinberg
Martin G. Weinberg
BBO No. 51940
Oteri, Weinberg & Lawson, P.A.
20 Park Plaza, Suite 905
Boston, MA 02116
Tel. (617) 227-3700

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants, and a copy sent via email to Sean P. Buckley, U.S.P.O. (sean_buckley@map.uscourts.gov), on July 5, 2007.

<u>/s/ Francis J. DiMento</u>